## STATE v. KEITH A. OLSON.

135 N. W. (2d) 181.

April 15, 1965—No. 39,425.

*Maurice A. Klasen,* for appellant.

*Robert W. Mattson,* Attorney General, and *William B. Randall,* County Attorney, for respondent.

FRANK T. GALLAGHER, C.

This is an appeal from a judgment of the district court. Defendant agrees that the facts are those presented by the state. The essential acts occurred at the Unicorn Cafe in downtown St. Paul on July 18, 1963.

A waitress at the cafe, age 18, testified that around 10 o'clock that evening two men, one of them the defendant, entered the cafe, sat at the counter, and after some conversation ordered some unfermented grape juice. When the witness was asked by the prosecuting attorney if she noticed anything peculiar about the appearance of the defendant, she replied, "[T]he only thing I could tell was the way he talked and the way he looked. His eyes were kind of glassy and he kind of wobbled a little bit." She also observed something unusual about his speech.

After taking defendant's order for the juice, she said he asked her if she "wanted to get high." She replied that she didn't drink and he said she wouldn't have to. The witness then said that after serving him the drink he gave her "a dollar bill with a white envelope" and told her to keep the change but she "gave him the change and the envelope back." She explained that the envelope "was folded in about four by four" and that she could tell by feeling it that it contained a powdered substance. She stated that when she returned the change and envelope to the defendant she told him that she "thought it was some form of dope and then they got up and left."

After they left, the police department was called but not by the witness. Two detectives from the department promptly appeared upon the scene and she made a report to them. After taking her report the officers left the cafe, and shortly afterwards the defendant and his companion came back. She directed them to the second floor with a bal-

cony "looking downstairs" and told them she would bring them some coffee. Soon the officers came back, asked her if the two who had just entered were the men who had been reported earlier, she said they were, and the officers went upstairs. Later the officers called her to come up and identify the one who had the envelope. She said that she had a conversation with Detective Gray in the presence of the defendant; that she told him it was the defendant who had the envelope.

On cross-examination the witness said that she had never seen anyone who had been under the influence of narcotics nor had she ever heard anything to the effect that the cafe was a hangout for people using narcotics. In reply to a question by her examiner, she said that she told Tom Mishou, age 17, who was in the cafe when defendant and his companion first came in, that she thought that they might have some form of narcotics. When asked why she thought so, she replied "the way he [defendant] said it and he handed it to me." She said that she did not know what was in the envelope and would not know marijuana if she saw it. Mishou also said on cross-examination by the defense that the waitress told him she suspected that there were narcotics in the envelope and that in his conversation with the police he told them that the "two men * * * appeared to be trying to influence [the waitress] into using some substance."

Detective Gray of the Morals Division, called by the state, testified that he and Detective Skarolid went to the Unicorn Cafe about 10:20 that evening in response to a call by the police dispatcher and interviewed the waitress; that she made a report and gave them a description of the two men. After receiving the information, they left the cafe. As they returned to their car, they observed two men pass who could possibly fit the description given them by the waitress. The men went into the cafe and the officers followed them and asked the waitress if they were the two men who had been there previously. Upon being informed that they were, the officers followed them to the mezzanine floor. The witness, after identifying himself as a detective, asked the defendant for some identification as to his age and address. Detective Skarolid questioned the other man. In connection

with the requested identification, Gray stated that the defendant replied, "What do you want to know that for, man?" "Am I under arrest, man? What's going on here, man?" and that he kept that up; that when he asked, "Am I under arrest?" the officer said he told him approximately three times that he was. While conversing with the defendant, the detective said that he observed that the former acted a little unusual, "a little wildlike," but he did not detect any liquor on his breath. However, he said that defendant acted "kind of high," as if he could have been drinking. His eyes—pupils—had a "kind of popeyed look." After asking the officer several times if he was under arrest, the defendant produced a selective service card for identification.

The officer further testified that the waitress was summoned to the second floor and in the presence of the defendant was asked if he was the man who "offered her the envelope to get high" and her answer was "Yes." He said he then asked the defendant some further questions to verify the identification and took him into custody and restrained him.

Detective Gray was then asked on direct examination what other investigation was made after defendant's restraint. This was objected to, and following a prolonged discussion between the court and counsel with respect to motions, offers of proof, and reservations on ruling by the court in connection with evidentiary and procedural matters, the witness was permitted to answer.

He said, after repeating some of the matters referred to above in connection with his investigation, that he had cause to believe that the defendant "might be either using or having the possession of the narcotic, mostly the reason of probably possessing it because of what she [the waitress] had told me." He then proceeded to search the defendant. He had the defendant take off his coat, which he searched, then had him take his belongings out of his pockets and lay them on a table. He searched his pockets and found the white envelope still in his pocket. When he opened the envelope, he found some green substance in the bottom of it which he said appeared to be "sort of a granule, leafy, kind of a little seedy substance." He asked the de-

fendant what the substance was that was in the envelope and his answer was "Tea." The defendant and his companion were taken to police headquarters. The witness said he retained the white envelope he had taken from the defendant and sent it to the crime laboratory to be analyzed.

Detective Skarolid, who was with Detective Gray at the time of defendant's arrest, testified along the same lines as Detective Gray regarding matters leading up to and pertaining to defendant's arrest and the white envelope taken from the defendant at the time of the search. Theodore Elzerman, criminologist in charge of the St. Paul police crime laboratory, explained tests he had made in connection with the contents of the envelope and said that his findings were that the green, leafy material contained in the white envelope was marijuana or cannabis sativa, the botanical name.

The proceedings in this case were commenced by a complaint in the municipal court of St. Paul in July 1963. At a preliminary hearing the next month defendant was bound over to the district court. In September 1963 he moved the district court to suppress the use as evidence of certain property taken from his person by the St. Paul police officers. The defendant was present and was also represented by his counsel. He contended that his arrest, admittedly made without a warrant, was unlawful and that any product of a search incident thereto must be suppressed. In its memorandum dated October 8, 1963, denying defendant's motion, the court found that considered in its entirety the information within the knowledge of the police officers at the time they arrested the defendant furnished grounds for a reasonable belief that the defendant had committed and was committing the offense of possession of a narcotic drug and that the arrest and search incident thereto were lawful. The matter was next raised and presented to the district court before another judge on the same basis and ground during defendant's trial and was denied. Defendant was convicted and appealed to this court in February 1964.

Defendant argues in his brief that the evidence introduced by the state was obtained by an unlawful arrest and a search made without a warrant and that the trial court erred in denying his motion to suppress.

He contends that a citizen cannot be arrested without a warrant unless there is reasonable and probable cause to believe him guilty of a felony and that a search without a warrant cannot be justified as an incident to an arrest unless the arrest itself is lawful.

Defendant's attorney admits in his brief that on the evening involved defendant entered a coffee shop in St. Paul and was waited on by an 18-year-old waitress; that he acted in an unusual manner, indicative of intoxication; that he suggested that the waitress get "high," held an envelope out in his hand, and the police were called. His attorney claims, however, that the waitress did not open the envelope or smell its contents and that she testified that she would not recognize marijuana if she saw it. He reviewed Detective Gray's testimony to the effect that while the detective thought defendant had been drinking, he did not determine that he was drunk; that he had never seen the waitress before that evening; that he had observed defendant less than 5 minutes; and that he had observed only a few persons under the influence of narcotic drugs. He also referred to the testimony of the criminologist along the lines that he would have to observe about 25 persons under the influence of narcotics before he could distinguish that condition from intoxication. He concludes that a lawful arrest without a warrant requires probable cause and there was none here.

It appears to us that the controlling legal issue here is whether the arrest of the defendant under the facts and circumstances of this case was lawful so as to authorize a search of his person.

The rule that evidence obtained as a result of an illegal search and seizure cannot be admitted in state criminal court proceedings without violating the Fourteenth Amendment of the United States Constitution was established in 1961 by Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081, 84 A. L. R. (2d) 933. The scope of that rule was extended in 1963 in Ker v. California, 374 U. S. 23, 83A S. Ct. 1623, 10 L. ed. (2d) 726, which held that the United States Supreme Court is not bound by a state court's determination as to the legality of arrest and incidental search. Although there are limits to the permissible scope of a search without a warrant, incident to a lawful arrest, we proceed on the premise that if the ar-

rest in the instant case was lawful those limits were not exceeded here. It therefore follows that the constitutional validity of the officer's search of defendant in this case must depend upon the constitutional validity of his arrest, and that in turn depends upon whether at the time of his arrest probable cause existed—that is, whether at the time of the arrest the facts and circumstances within their knowledge and regarding which they had reasonably trustworthy information were sufficient to warrant a prudent officer or person in believing that the defendant had committed or was committing an unlawful offense. Beck v. Ohio, 379 U. S. 89, 85 S. Ct. 223, 13 L. ed. (2d) 142. As stated in Brinegar v. United States, 338 U. S. 160, 176, 69 S. Ct. 1302, 1311, 93 L. ed. 1879, 1891:

"* * * The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

In connection with the matter as to whether or not the record in this case can support a finding of probable cause as a basis for defendant's arrest, the United States Supreme Court in Ker v. California, *supra,* stated that while it does not sit to appraise contradictory factual questions, it will where necessary to determine constitutional rights make an independent examination of the facts, findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental, constitutional criteria established by that court has been respected. That decision went on to say (374 U. S. 34, 83A S. Ct. 1630, 10 L. ed. [2d] 738):

"* * * The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain." See, also, Jones v. United States, 362 U. S. 257, 80 S. Ct. 725, 4 L. ed. (2d) 697.

In State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, involving a writ of error to review a judgment in district court where the defendant was convicted of first-degree robbery, this court stated that probable cause is to be evaluated from the viewpoint of a prudent and cautious police officer on the scene at the time of arrest; also, that the question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested.

In State ex rel. Branchaud v. Hedman, 269 Minn. 375, 130 N. W. (2d) 628, it appeared to be the claim of the defendant that the evidence used against him was the product of an exploratory search without probable cause in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution. We stated in that case that while Mapp v. Ohio, *supra,* and other United States Supreme Court decisions clearly established that under state and Federal procedure citizens are entitled to uniform protection from unreasonable searches and seizures, it was not our understanding that those decisions had gone so far as to require or suggest that state police officers follow precise procedures in making arrests, searches, and seizures. We also said in the Branchaud case that the Fourth Amendment protects the individual only from "unreasonable" searches and seizures and whether a search and seizure is unreasonable must depend on the particular facts in each case.

Defendant contends that the legality of his arrest depends upon whether the officers without a search warrant had "probable cause" to believe him guilty of a felony. Our function is to determine whether the facts available to the officers at the time of the arrest would warrant a person, using reasonable caution, to believe that the defendant had committed an offense. Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543.

Considering the facts of this case leading up to and including the arrest and search of the defendant, it is our opinion that under the authorities cited the information and evidence available to the officers when they arrested the defendant were sufficient to warrant a belief on

their part that the defendant had or was about to commit an offense and that there was sufficient probable cause to lawfully arrest him and to authorize them to search him thereafter without a warrant. This is substantiated by the fact that a search of the defendant revealed that he did have a white envelope on his person and that according to a criminologist who made the laboratory test it contained marijuana.

The facts in this case differ from Beck v. Ohio, 379 U. S. 89, 85 S. Ct. 223, 13 L. ed. (2d) 142, where the United States Supreme Court (three justices dissenting) found that the arrest of the petitioner could not on the record there "be squared with the demands of the Fourth and Fourteenth Amendments." In that case the court invalidated a search made incident to an arrest because of the absence of probable cause. The court said (379 U. S. 95, 85 S. Ct. 228, 13 L. ed. [2d] 147):

"* * * the record in this case does not contain a single objective fact to support a belief by the officers that the petitioner was engaged in criminal activity at the time they arrested him."

That is not the situation here. Rather, it appears that the facts referred to above, together with reasonably trustworthy information and their general experience as police officers in dealing with incidents of this type, warranted them as prudent men in believing that the defendant committed or was committing the offense for which he was arrested. As stated by Mr. Justice Clark in his dissent in Wong Sun v. United States, 371 U. S. 471, 498, 83 S. Ct. 407, 423, 9 L. ed. (2d) 441, 462:

"* * * While probable cause must be based on more than mere suspicion * * * it does not require proof sufficient to establish guilt."

In United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. ed. (2d) 684, Ventresca was convicted in the United States District Court for Massachusetts for possessing and operating an illegal distillery. The conviction was reversed by the court of appeals on the ground that the affidavit for a search warrant pursuant to which the still was found was insufficient to establish probable cause. In re-

versing the court of appeals the Supreme Court pointed out that while a warrant may issue only on a finding of probable cause the court has long held that the term probable cause means less than evidence which would justify condemnation and that a finding of probable cause may rest upon evidence which is not legally competent in a criminal trial. The court stated that while it was alert to invalidate unconstitutional searches and seizures it was equally concerned to uphold the actions of law enforcement officers consistently following the proper constitutional course.

Affirmed.