**STATE of Minnesota, Respondent,**

v.

**Joel Robert HENNING, Appellant.**

No. C9–01–1985.

Supreme Court of Minnesota.

July 31, 2003.

Gary A. Gittus (# 175547), George F. Restovich & Associates, Rochester, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, Terry L. Adkins (# 0215259), Rochester City Attorney, Peter D. Magnuson, Rochester Assistant City Attorney, Rochester, MN, for Respondent.

Teresa J. Nelson (# 269736), Minnesota Civil Liberties Union, St. Paul, MN, Sara L. Martin (# 287064), Volunteer Attorney for the Minnesota Civil Liberties Union, Minneapolis, MN, for Amicus Curiae.

## OPINION

GILBERT, Justice.

This case involves a challenge to an investigative stop made pursuant to Minn. Stat. § 168.0422 (2002). Appellant Joel Robert Henning was charged in Olmsted County with driving after revocation, Minn.Stat. § 171.24, subd. 2 (2002), no driver's license in possession, Minn.Stat. § 171.08 (2002), and no current proof of insurance, Minn.Stat. § 169.791(2) (2002).[1] Appellant moved to dismiss the charges for the following reasons: 1) there was no reasonable articulable suspicion to justify the stop of the vehicle, and 2) Minn.Stat. § 168.0422 is unconstitutional. An omnibus hearing was held in Olmsted County District Court; the arresting officer was the only witness to testify. The court issued an omnibus order concluding: 1) Minn.Stat. § 168.0422 is unconstitutional; 2) the fact that the vehicle carried a WZ series plate provided reasonable and articulable suspicion of criminal activity justifying the stop.

Appellant, pursuant to *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980), agreed to stipulate to the facts contained within the police reports and his certified driving record. A bench trial was held on May 11, 2001, in Olmsted County District Court. In an order and memorandum, the court incorporated the ruling from the earlier omnibus hearing concluding that Minn. Stat. § 168.0422 is unconstitutional and the fact that defendant's vehicle carried special WZ series plates provided a reasonable and articulable suspicion of criminal activity justifying a stop. The court found appellant guilty of driving after revocation, Minn.Stat. § 171.24, subd. 2, and no driver's license in possession, Minn. Stat. § 171.08. Appellant appealed to the Minnesota Court of Appeals. The court of appeals held that by applying for and displaying special series plates issued pursuant to Minn.Stat. § 168.041, subd. 6, a party implicitly consents to a vehicle stop based solely on the display of those plates and concluded Minn.Stat. § 168.0422 is constitutional under both the federal and state constitutions. *State v. Henning*, 644 N.W.2d 500 (Minn.App.2002). We reverse.

On July 12, 2000, at 7:30 p.m., an Olmsted County deputy sheriff, while on patrol in Rochester, Minnesota, noticed a vehicle with special series registration plates with the first two letters WZ. The deputy followed the vehicle, but did not observe any inappropriate driving, recognize the driver, discern any other traffic or other violations, nor did he run a vehicle registration check. The deputy stopped the vehicle being driven by appellant without reasonable suspicion that appellant was involved in any criminal activity. The vehicle was registered to appellant's father. The regu-

---

1. The no proof of insurance charge was later dropped when proof of insurance coverage was provided to the court.

larly issued registration plates on that vehicle had been impounded April 2, 2000, on account of appellant's prior DUI conviction. The deputy testified that the only reason appellant was stopped was because his vehicle had special series registration plates issued when the previous plates were impounded because the operator of the vehicle was driving under the influence.

According to the deputy, appellant initially told the deputy that he knew he could be stopped based on the registration plates he had on the vehicle. However, appellant went on to tell the deputy that he had no reason to pull him over. Appellant expressed his belief that to pull him over the deputy needed a reason in addition to the registration plates. There were no indicators that appellant had been consuming alcohol. Appellant did not have a valid driver's license in his possession at the time of the stop because his driver's license had been revoked. Appellant was cited for driving after revocation, Minn. Stat. § 171.24, subd. 2, no driver's license in possession, Minn.Stat. § 171.08 and no current proof of insurance, Minn.Stat. § 169.791(2).

An omnibus hearing was held and the court issued an order concluding that Minn.Stat. § 168.0422 is unconstitutional, but that the presence of the special series plates provided the deputy with reasonable articulable suspicion to justify the stop of appellant's vehicle. The parties stipulated to the police reports and appellant's prior record for the purposes of a bench trial. The court convicted appellant of driving after revocation, Minn.Stat. § 171.24, subd. 2 (2002) and no driver's license in possession, Minn.Stat. § 171.08 (2002). It adopted the conclusions from the earlier omnibus hearing that Minn.Stat. § 168.0422 is unconstitutional, but the special series plates provided reasonable artic-

ulable suspicion of criminal activity to justify the stop. Appellant was ordered to pay a fine of $300 plus a $35 surcharge and a $5 library fee, with sentence stayed pending appeal. On appeal, the court of appeals held that by applying for and receiving special series plates, a party implicitly consents to police stops for the purpose of determining whether the driver has a valid license, based solely on those registration plates, and that Minn.Stat. § 168.0422 did not violate the state or federal constitutions. *Henning*, 644 N.W.2d at 502–04.

## I.

Appellant argues that Minn.Stat. § 168.0422 is an unconstitutional attempt to override the Minnesota Court of Appeals ruling in *State v. Greyeagle*, 541 N.W.2d 326 (Minn.App.1995); violates the Fourth Amendment of the United States Constitution and its counterpart, Article I, Section 10 of the Minnesota Constitution; unconstitutionally interferes with and chills protected activities; and cannot form the sole basis for the stop of a motor vehicle.

We review the constitutionality of a statute de novo. *State v. Grossman*, 636 N.W.2d 545, 548 (Minn.2001). "Statutes are presumed constitutional." *Id.* The party challenging the statute must show, beyond a reasonable doubt, that the statute violates the constitution. *Id.*

Minnesota Statutes § 168.0422 provides:

A peace officer who observes the operation of a motor vehicle within this state bearing special series registration plates issued under section 168.041, subdivision 6, or 169A.60, subdivision 13, may stop the vehicle for the purpose of determining whether the driver is operating the vehicle lawfully under a valid driver's license.

Special plates may be issued under Minn.Stat. § 168.041, subd. 6, in the following circumstances:

> if a member of the violator's household has a valid driver's license, the violator or owner has a limited license issued under section 171.30, or the owner is not the violator and the owner has a valid or limited license or a member of the owner's household has ˙a valid driver's license.[2]

Similar conditions are provided by Minn. Stat. § 169A.60, subd. 13:

> (1) the violator has a qualified licensed driver whom the violator must identify;
>
> (2) the violator or registered owner has a limited license issued under section 171.30;
>
> (3) the registered owner is not the violator and the registered owner has a valid or limited driver's license;
>
> (4) a member of the registered owner's household has a valid driver's license.

The statute at issue here, Minn.Stat. § 168.0422, appears to have been passed in response to the court of appeals' decision in *Greyeagle*. In *Greyeagle*, the court of appeals held that police may not make suspicionless stops of drivers based solely on special series registration plates, where the statute creating the special plates does not provide that the plates are issued under that condition. *Greyeagle*, 541 N.W.2d at 328, 330. The court of appeals also held that where the state produces no evidence that the policy of making suspicionless stops is more effective than the traditional system of stops based on particular suspicion, the routine stops of special series registered vehicles is unconstitutional. *Id.*

at 329. Minnesota Statutes § 168.0422 was subsequently passed by the legislature in order to authorize the stops prohibited by the court of appeals ruling in *Greyeagle*. The primary issue is whether the statute is prohibited by the Fourth Amendment or its counterpart, Article I, Section 10 of the Minnesota Constitution. If the statute violates the Fourth Amendment or Article I, Section 10 of the Minnesota Constitution, it cannot stand.

▮ In *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court held that absent reasonable articulable suspicion, stopping an automobile driver to check whether he is properly licensed is prohibited by the Fourth Amendment. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions * * *.'" *Id.* (citations omitted). "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 654, 99 S.Ct. 1391.

▮ Generally, an officer stopping a vehicle on the open road in order to check the driver's license is a "seizure" under the Fourth Amendment. *Prouse*, 440 U.S. at 653, 99 S.Ct. 1391. An officer must have reasonable articulable suspicion of wrongdoing in order to justify such a stop. *Id.* at 663, 99 S.Ct. 1391.

The state argues that by applying for and receiving the special series plates, ap-

---

**2.** Limited licenses are issued pursuant to Minn.Stat. § 171.30 when a person's license has been suspended or revoked but the person needs a license to attend school, work, or treatment or to accomplish the tasks required as a homemaker.

pellant was aware that his use of that vehicle carried with it a condition giving the police the statutory authority to stop the vehicles bearing those plates without reasonable articulable suspicion. The state argues appellant "destroyed" any reasonable expectation of privacy he may have had which would allow him to object to the search. We disagree.

Here, appellant had a subjective expectation of privacy. He expressed his opinion that the officer needed to have a reason to stop him separate from the mere presence of the special series registration plates. It is not clear from the record that appellant was put on notice that these plates were accepted on the condition that law enforcement may stop the vehicle at any time to check the validity of the driver's license. We decline to imply consent under these facts.

The special series registration plates are only issued upon a showing that someone will be legally driving the vehicle bearing those plates. This person may be the violator, who may be issued a limited license to drive under certain circumstances, such as attending work or school. Minn.Stat. § 171.30. However, the special series plates are also issued where someone other than the violator, either a member of the violator's household or someone else identified to the commissioner of public safety, will be lawfully driving the vehicle. These qualified, licensed drivers of the specially registered vehicles are also subject to the possibility of numerous stops made each and every day, pursuant to Minn.Stat. § 168.0422, solely on account of driving a motor vehicle bearing special series registration plates. Thus, Minn. Stat. § 168.0422 subjects a number of licensed motorists, who were not party to the original revocation of the registration plates or the subsequent reissuing of the special series plates, to the possibility of

being stopped by every law enforcement officer they encounter.

■ We look to the totality of the circumstances to determine whether a stop under these facts was reasonable. *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). The degree of the intrusion must be weighed against the promotion of legitimate government interests. *Id.* at 119, 122 S.Ct. 587.

Minnesota Statutes § 168.0422 seeks to dispense with the individualized suspicion requirement. In *Ascher v. Comm'r of Public Safety,* we, exercising our independent authority to interpret the Minnesota Constitution, held that using roadblocks to stop all vehicles at sobriety checkpoints violates "Minn. Const. art. I, § 10, which we have long held generally requires the police to have an objective individualized articulable suspicion of criminal wrongdoing before subjecting a driver to an investigative stop." 519 N.W.2d 183, 187 (Minn. 1994). In *Ascher,* we "engaged in a judicial determination of the reasonableness of the use of a temporary roadblock to stop a large number of drivers in the hope of discovering evidence of alcohol-impaired driving by some of them." *Id.* at 187. We concluded:

> Based primarily on the state's failure to meet its burden of articulating a persuasive reason for dispensing with the individualized suspicion requirement in this context, we conclude that the constitutional balance must be struck in favor of protecting the traveling public from even the "minimally intrusive" seizures which occur at a sobriety checkpoint.

*Id.* at 187.

Our reasoning in *Ascher* applies to stops under Minn.Stat. § 168.0422. Although a smaller number of drivers are potentially affected, those drivers may be stopped daily on numerous occasions without reason-

able articulable suspicion of any criminal activity, solely because the vehicle carries the special series registration plates. The state has not met its "burden of articulating a persuasive reason" for dispensing with the general requirement of individualized suspicion in this context. *Ascher*, 519 N.W.2d at 186. In *Prouse*, the Supreme Court pointed out that where individualized suspicion is not required to make a stop, other safeguards are relied upon to assure that a driver's reasonable expectation of privacy may not be invaded at the discretion of a patrolling officer. 440 U.S. at 654–55, 99 S.Ct. 1391. Minnesota Statutes § 168.0422 seeks to eliminate the constitutional safeguard requiring an officer to have reasonable articulable suspicion of criminal activity before stopping a motorist, but provides no substitute to protect licensed motorists driving in vehicles with special series plates from repeated stops at the unchecked discretion of law enforcement officers. As we noted in *Ascher*, the police should not be allowed to define the reasonableness of their own conduct. *Ascher*, 519 N.W.2d at 186. Neither is the legislature empowered to redefine the constitutional parameters of police conduct. Therefore, based on *Ascher* and *Prouse*, we conclude Minn.Stat. § 168.0422 is unconstitutional under the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution.

## II.

■■■■ The district court held Minn. Stat. § 168.0422 unconstitutional, but concluded the stop was lawful because there existed "a reasonable and articulable suspicion of criminal activity justifying the stop." We agree that Minn.Stat. § 168.0422 is unconstitutional. To effectuate a stop of a vehicle an officer must have a reasonable articulable suspicion that the motorist is violating the law. *Prouse*, 440 U.S. at 663, 99 S.Ct. 1391. However, the mere presence of the special series plates does not amount to "reasonable articulable suspicion."

■■■■ We do not believe the presence of special series registration plates issued pursuant to Minn.Stat. § 168.041, subd. 6 or Minn.Stat. § 169A.60, subd. 13, amounts to reasonable articulable suspicion nor do the circumstances surrounding the issuance of the plates render a suspicionless stop of a driver in a vehicle with these plates "reasonable." The U.S. Supreme Court has articulated that reasonable suspicion must be examined by the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). An analysis of the totality of the circumstances "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.* at 418, 101 S.Ct. 690.

Special series registration plates are issued, upon the satisfaction of conditions set forth by statute, in order to enable continued legal use of a motor vehicle by licensed drivers. Minn.Stat. § 168.041, subd. 6; Minn.Stat. § 169A.60, subd. 13. The driver of the vehicle is not necessarily the one whose actions led to the original impoundment and subsequent issuing of special series plates. Because the special series plates are only issued when it is demonstrated that the vehicle may lawfully be driven, we hold that the mere presence of special series plates does not amount to reasonable articulable suspicion of criminal activity and, in fact, the special plates demonstrate that the vehicle may be lawfully driven. Nor is it reasonable to automatically infer that there is a substantial possibility that the driver of the vehicle does not possess a valid driver's license. While the special series plates may be a factor for law enforcement to consider and would provide a basis for closer scrutiny of these

vehicles, the special series plates may not provide the sole justification for a stop.

The dissent approves "this type of (suspicionless) stop" and deems it "reasonable because [of the] substantial state interest in safeguarding our roads from drivers who repeatedly drive while impaired." However, the dissent ignores the showing we required in *Ascher*. *Ascher*, 519 N.W.2d at 186. We have never before simply allowed the ends to justify the means when the means void our citizens' constitutional protections. The dissent's rationale would be a dramatic departure that demotes constitutional protections to a position inferior to that of traffic safeguards. The state has not met its burden of showing that it is impracticable for police to develop individualized suspicion and that a departure from the individualized suspicion requirement will significantly help police achieve a higher rate of arrest than would using more conventional means of apprehending alcohol impaired drivers. *Ascher*, 519 N.W.2d at 186. Therefore, the balance must be struck in favor of protecting the traveling public from even the "minimally intrusive" seizure present here. *Id.* at 187.

We recognize that the practice of impounding standard license plates may further the state's interest in protecting the public from repeat drunken drivers. The state has an obvious and substantial interest in safeguarding our roads from such drivers. However, the subsequent issuance of special plates to allow the vehicle to again be driven does not necessarily further the state's interest in protecting the public, but may enable or facilitate the

impaired driver's use of the same vehicle. Furthermore, the dissent fails to explain why these plates should be used to annul constitutional protections. Contrary to what the dissent surmises, these special plates do nothing to "ensur[e] that repeat offenders do not harm the motoring public by driving during their period of revocation." Rather, these special plates may actually provide a further opportunity for repeat drunken drivers to drive again by making available a properly licensed vehicle.[3]

Having concluded that Minn.Stat. § 168.0422 is unconstitutional under the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution, we need not address appellant's other arguments. We reverse the court of appeals and hereby vacate appellant's convictions for driving after revocation, Minn.Stat. § 171.24, subd. 2, and no driver's license in possession, Minn.Stat. § 171.08, as the product of an unlawful seizure. We limit the retroactive application of this ruling to cases pending on the date of this decision in which the constitutionality of this statute has been properly raised in a timely fashion.

Reversed.

MEYER, Justice (dissenting).

I respectfully disagree with the majority's conclusion that Minn.Stat. § 168.0422 (2002) violates the Minnesota and federal constitutions. Officer Maitland's stop of Joel Henning, limited as it was to inquiring

---

**3.** The dissent relies upon numerous studies, statistics and anecdotal conclusions, which are not part of the record, in order to justify an unconstitutional intrusion. There obviously are important policy considerations involved with addressing the problem of repeat drunken drivers. Other options are available to the legislature that could directly address the problem of repeat drunken drivers without trampling on the constitutional rights of our citizens, including simply declining to issue the special plates or subjecting the vehicle driven to forfeiture.

about the validity of his driver's license, was a reasonable seizure and therefore not prohibited by either the state or federal constitution. This type of stop, authorized by statute, is reasonable because the substantial state interest in safeguarding our roads from drivers who repeatedly drive while impaired, combined with the focused nature of the practice, outweigh the limited intrusion on individual liberty. Aside from whether the balancing test weighs in favor of the seizure's reasonableness, the statute should be upheld because the owner of the vehicle gave consent to a suspicionless stop when he applied for the special plates.

The state has devised a system for impounding license plates as part of its overall scheme of keeping the traveling public safe on the roads. The legislature has passed laws making driving under the influence of drugs or alcohol a crime. Minn. Stat. ch. 169A (2002). Violating these statutes once is a gross misdemeanor, and repeat offenders can be sent to jail for months. Minn.Stat. § 169A.275 (2002). The state will revoke an individual's license to drive and impound that individual's license plates during the period of the revocation. Minn.Stat. §§ 169A.54–.60 (2002). Taking away the license plates is a particularly important step in this procedure, because it ensures that individuals who are repeat offenders of our driving laws will not be able to illicitly drive their vehicles unnoticed.

The record establishes that Henning had driven while impaired twice within 5 years. Because of those violations, the state impounded his license plates and revoked his driver's license as required by statute.

Minn.Stat. §§ 169A.54–.60.[1] Then, in order to obtain plates denoted by the prefix WZ, Henning's father requested these special-issue plates and demonstrated to the court that he owned the vehicle and had a valid license to drive.[2]

The Fourth Amendment of the United States Constitution, as well as Article I, Section 10 of the Minnesota Constitution, are implicated in this case because "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the constitution], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). What both constitutions prohibit is "not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *see also* U.S. Const. amend. IV; Minn. Const. art. I, § 10; *State v. Olson*, 271 Minn. 50, 57, 135 N.W.2d 181, 186 (1965). After it has been established that a police practice amounts to a search or seizure, the analysis of what searches and seizures are unreasonable, and therefore unconstitutional, involves balancing competing interests. *See Prouse*, 440 U.S. at 654, 99 S.Ct. 1391; *State v. Larsen*, 650 N.W.2d 144, 148 (Minn.2002); *Ascher v. Comm'r of Pub. Safety*, 519 N.W.2d 183, 185–86 (Minn.1994). The balancing test involves three factors: the gravity of the public concern served by the seizure; the degree to which the seizure advances the public interests; and the severity of the interference with individual liberty. *Ascher*, 519 N.W.2d at 185 (citing *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61

---

**1.** Joel Henning's plates were impounded under Minn.Stat. § 168.042 (1998), which is now repealed, but carried the same substantive provisions as sections 169A.54–.60.

**2.** Other circumstances for issuance include when the violator himself has a limited license to perform essential tasks. *See* Minn. Stat. §§ 168.041, subd. 6; 169A.60, subd. 13; 171.30 (2002).

L.Ed.2d 357 (1979)). The question presented in this case is whether it is reasonable for a peace officer to stop a driver of a WZ vehicle and inquire about his or her driver's license without any additional particularized suspicion.

The first factor to weigh in the balance is the gravity of the public concern served by the seizure. The state has a substantial interest in keeping our roads safe. *See Prouse*, 440 U.S. at 658, 99 S.Ct. 1391. As part of its efforts to keep roads safe, the state must grapple with the problem of people who drive under the influence. We have recognized on multiple occasions the seriousness of this problem. *See, e.g., Ascher*, 519 N.W.2d at 185 (citing the magnitude of the problem with drunk driving and the strong state interest in eradicating it); *Heddan v. Dirkswager*, 336 N.W.2d 54, 62–63 (Minn.1983) (discussing the relationship of drunk driving to tragedy on the highways). Despite the best efforts of legislators and law enforcement, impaired drivers continue to present a very real danger, causing a disproportionate number of traffic deaths each year.[3] These accidents exact a tragic cost on the families of the individuals involved and are a drain on the financial resources of the state.[4]

Even more specifically, the practice of impounding standard plates and issuing special plates is intended to further the state interest in protecting the public from individuals who *repeatedly* drive under the influence or without a driver's license. The National Highway Traffic Safety Administration (NHTSA) reports that approximately one-third of all drivers arrested or convicted of driving while impaired each year are repeat offenders. National Highway Traffic Safety Administration, *Vehicle & License Plate Sanctions, at* www.nhtsa.gov/people/outreach/safe sobr/19qp/factsheets/vehicle.html (last visited June 30, 2003). In addition, repeat offenders are "overrepresented in fatal crashes and have a greater relative risk of fatal crash involvement." *Id.*[5] In addition many second- and third-time convicted DWI offenders are involved in traffic offenses or crashes during their suspension. *Id.* I conclude that repeat offenders of our laws against driving while impaired pose a serious threat to the safety of other travelers, and the seizure authorized by this statute addresses that threat.

The second factor in the balancing test concerns the efficacy of the stops at issue. The court was presented with no statistics as to how frequently peace officers find legal drivers at the wheel when they stop cars with special-issue plates of this variety. However, a study of Minnesota's

---

3. In 2001, there were 226 alcohol-related traffic fatalities in Minnesota, which constituted 40% of all traffic deaths in that year. Mothers Against Drunk Driving, *State–by–State Traffic Fatalities—2001, at* http://www.madd.org/stats/0,1056,4809,00.html (last visited June 30, 2003).

4. It is estimated that the average alcohol-related fatality costs the State of Minnesota $3.5 million. Public Services Research Institute, *Impaired Driving in Minnesota, at* www.nhtsa.gov/people/injury/alcohol/MN.htm (last visited June 30, 2003). Using the number of traffic deaths reported in note 3, alcohol-related fatalities cost Minnesota an estimated $791 million in the year 2001.

5. Interestingly, the NHTSA includes among its recommendations for strengthening states' license plate sanctions that states allowing special-issue plates "incorporate a provision that permits officers to stop the vehicle for the sole purpose of checking whether the driver is operating the vehicle while their license is under suspension." National Highway Traffic Safety Administration, *Vehicle & License Plate Sanctions, at* www.nhtsa.gov/people/outreach/safesobr/19qp/factsheets/vehicle.html (last visited June 30, 2003). Minnesota is one of three states that issue special license plates as part of its efforts to monitor repeat offenders. *Id.*

plate impoundment system found "a significant decrease in recidivism for violators who had their plates impounded versus violators who did not. Violators whose license plates were impounded by the arresting officer showed a 50 percent decrease in recidivism over a 2–year period (when compared with DWI violators who did not experience impoundment)." *Id.* The decrease in recidivism suggests that the impoundment scheme is furthering the state's interest in protecting the public from the unsafe driving habits of repeat offenders. As our WZ plates are a key aspect of ensuring that repeat offenders do not harm the motoring public by driving during their period of revocation, and this statute is narrowly tailored to the population of repeat offenders, it reasonably advances the public interest.

I turn now to the third factor, the "nature and quality" of the intrusion on liberty entailed by the seizure. *See Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this case, we face a situation in which a narrow class of people—individuals driving with WZ plates—can be stopped by an officer for the purpose of ensuring that they are operating the vehicle within the scope allowed them by our state licensing agency. Although potentially aggravating, intimidating, and embarrassing, the purpose of the stop is limited and the resulting detention is brief, just long enough for the officer to ensure the driver has a valid license.[6]

Having considered the gravity of the public concern presented by repeat offenders of our drunk driving laws, the focused nature of this statute as part of the state's enforcement scheme, and the extent of the intrusion involved when an officer asks to see the operator's license to drive, I conclude this practice is a reasonable seizure and therefore the statute does not violate either the state or federal constitution. I emphasize here that the scope of the seizure authorized by statute is limited: it authorizes the stop of a vehicle in order to determine the validity of the driver's license. Anything beyond that limited scope, justified by the state's need to protect the public from individuals who repeatedly drive under the influence, could be unreasonable. *See Terry*, 392 U.S. at 29, 88 S.Ct. 1868 (noting that "evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the

---

**6.** The majority describes the statute as subjecting legitimate motorists "to the possibility of being stopped by every law enforcement officer they encounter." The facts of this case do not establish that the actual government intrusion is unnecessarily invasive; there is no indication that other members of Henning's family were harassed while driving. In this case, Henning was the individual whose license had been revoked after he was caught driving under the influence of alcohol or drugs twice within 5 years. And Henning was the individual behind the wheel when Maitland stopped the car after noticing the special plates. Regardless, I would defer that concern for another day and only decide the constitutionality of Minn.Stat. § 168.0422 as applied to the facts before us. *See, e.g., Boutin v. LaFleur*, 591 N.W.2d 711, 716 (Minn.

1999) (finding predatory offender registration statute constitutional as applied to appellant); *State v. Chambers*, 589 N.W.2d 466, 480 (Minn.1999) (finding life sentence without possibility of release, as applied to appellant, constitutional); *Wheeler v. City of Wayzata*, 533 N.W.2d 405, 407 (Minn.1995) (finding Wayzata's zoning ordinance "not constitutionally invalid as applied here"). As applied to these facts, issues concerning the statute's breadth do not take on constitutional significance. The majority also expresses concern that the statute might authorize a suspicionless stop of a qualified driver who was not a party to the original revocation. I would also defer that concern to another day because the facts before us involve a driver whose violation caused the original revocation.

justification for their initiation" and that frisks justified by the protection of police officers and bystanders must be confined to an intrusion designed to discover hidden instruments that could be used in an assault); see also State v. Fort, 660 N.W.2d 415, 418 (Minn.2003) ("the scope and duration of a traffic stop investigation must be limited to the justification for the stop").

The majority attempts to analogize this case to the unconstitutional police practices at issue in *Prouse* and *Ascher*. Those cases are distinguishable in part because the intrusion affected many more people than does the intrusion authorized by Minn.Stat. § 168.0422. In *Prouse*, the police practice at issue was the arbitrary stop of any car on the road. 440 U.S. at 650, 99 S.Ct. 1391. And in *Ascher*, the practice at issue was temporary roadblocks used for sobriety tests, which detained all vehicles at a particular intersection. 519 N.W.2d at 184. In both of these cases the practices could potentially impact large populations, limiting the efficacy of the stop.

An additional difference between the instant case and *Ascher* is that *Ascher* did not involve a police action authorized by statute. The sobriety checks at issue in *Ascher* were an attempt by the police to use innovative tools to decrease drunk driving, but there was no statute prescribing the roadblocks. Because the court was faced with the constitutionality of a police practice, not a statute, the court was free to place the burden of proof on the state. *Ascher*, 519 N.W.2d at 187. In this case a statute is at issue, which shifts the burden of proof. Statutes are presumed constitutional, and the court traditionally uses its power to declare a statute unconstitutional "only when absolutely necessary." *State v. Larsen*, 650 N.W.2d 144, 147 (Minn. 2002). The party challenging the constitutionality of the statute bears the heavy burden of establishing its invalidity. *Heidbreder v. Carton*, 645 N.W.2d 355, 372 (Minn.2002). The mere "possibility" that lawful drivers may be repeatedly stopped should not suffice to meet the appellant's heavy burden of establishing the statute's invalidity. Nothing in the record before us convinces me it is "absolutely necessary" to strike down this statute.

Even if we were to conclude that the state's interest in regulating repeat DWI offenders does not outweigh the intrusion on those drivers' liberty, I would nevertheless conclude that the statute is constitutional because the owner of the vehicle gave consent to a suspicionless stop by applying for the special plates. That consent eliminated Henning's reasonable expectation of privacy, at least insofar as it included an expectation to be free from an investigative stop to confirm he was a licensed driver. *See State v. Perkins*, 588 N.W.2d 491, 493 (Minn.1999) ("But even a reasonable expectation of privacy may be waived if a defendant's conduct, objectively viewed in light of the totality of the circumstances, 'mandates the conclusion that any expectation of privacy was unreasonable'") (quoting *State v. Tungland*, 281 N.W.2d 646, 650 (Minn.1979)) (internal ellipsis omitted).

The majority opinion refuses to imply consent to a suspicionless stop because (1) Henning stated his view that the officer needed a separate reason to stop him, and (2) there was no evidence that Henning was put on notice that the special plates were accepted on the condition that law enforcement could stop the vehicle at any time. But the existence of a reasonable expectation of privacy, as a prerequisite to an unlawful search and seizure, depends not merely on the party's subjective expectations, but also on his or her objective expectations. *In re Welfare of B.R.K.*, 658 N.W.2d 565, 571 (Minn.2003) ("First, we

must determine whether B.R.K. exhibited an actual subjective expectation of privacy in the home and, second, whether that expectation is reasonable."). Henning did admit to the officer that he was on notice of the conditions under which the special plates were issued (in fact, he debated with the officer about the appropriate interpretation of those conditions). Henning is charged with notice of the law, and the law expresses those conditions. *See State v. Calmes*, 632 N.W.2d 641, 648 (Minn.2001).[7] Because consent is implied, neither the violator nor the person who applied for special plates has a reasonable expectation of privacy in the vehicle. The violator cannot rely upon any theoretical expectation of privacy that might be possessed by someone other than the violator or the applicant.

I would hold that Minn.Stat. § 168.0422 is constitutional, because it authorizes only reasonable seizures of individuals who have continually abused their driving privileges and, alternatively, it authorizes a stop of an individual who has revoked his or her reasonable expectation of privacy in the vehicle. Therefore, I would affirm the court of appeals.

BLATZ, Chief Justice (dissenting).

I join in the dissent of Justice Meyer.

HANSON, Justice (dissenting).

I join in the dissent of Justice Meyer.

---

7. It is not clear whether the majority is of the view that the legislature could never condition the issuance of special plates on the applicant's consent to suspicionless searches or only that the legislature did not do so with sufficient clarity here. I do not read the majority opinion as foreclosing further efforts by the legislature to make the applicant's consent more explicit.