*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1278**

Roger William Kuehn, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed April 25, 2016
Affirmed
Stauber, Judge**

Washington County District Court
File No. 82-CV-14-3902

Charles A. Ramsay, Ramsay Law Firm, P.L.L.C., Roseville, Minnesota (for appellant)

Lori Swanson, Attorney General, Amy Tripp-Steiner, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Stauber, Presiding Judge; Connolly, Judge; and Reilly, Judge.

## UNPUBLISHED OPINION

**STAUBER**, Judge

Appellant challenges the commissioner's order sustaining his driver's-license revocation, arguing that (1) the trooper impermissibly expanded the scope of the stop; (2) the trooper prevented him from exercising his right to an independent test; (3) the commissioner did not sustain her burden of proving the accuracy and reliability of the

blood test; and (4) the warrantless search and seizure of his blood was constitutionally defective. We affirm.

## FACTS

On June 26, 2014, Minnesota State Trooper Thomas Erickson stopped a vehicle for driving 60 miles per hour in a 45-mile-per-hour zone. As he approached the vehicle, which was driven by appellant Roger William Kuehn, Erickson noticed that the license-plate tabs had expired six months before, in December 2013. Erickson asked Kuehn for his license and mentioned the expired tabs; Kuehn claimed that he was on his way to get the new tabs. Erickson did not notice any indicia of alcohol consumption during this exchange and observed no other moving violations.

When Erickson ran Kuehn's record and the car registration on his patrol car computer, he discovered that the car's registration was current, despite the absence of new tabs, and that Kuehn had four prior driving-while-impaired (DWI) convictions. Erickson returned to the car and questioned Kuehn again about the registration. During this conversation, Erickson noted that Kuehn's eyes were bloodshot and watery, and he detected a "faint odor of an alcoholic beverage." Erickson asked Kuehn if he had anything to drink that day, and Kuehn replied that he had two glasses of wine the previous evening.

Based on these observations, Erickson asked Kuehn to do three field sobriety tests, which indicated impairment, and to take a preliminary breath test (PBT), which showed an estimated alcohol concentration of 0.183. Erickson arrested Kuehn and transported him to the Washington County jail, where he read Kuehn the implied-consent advisory,

2

which Kuehn indicated he understood.  Kuehn called an attorney, who advised him to take a breath test.  The breath test was unsuccessful in three different attempts, because the machine indicted an "interference error."[1]

Erickson then asked Kuehn if he would take a urine test.  Kuehn spoke again with his attorney and requested a blood test.  Erickson took Kuehn to Lakeview Hospital, provided the technologist with a standard DWI blood-draw kit, observed the blood draw, and then returned Kuehn to the jail.  Before the blood draw, Kuehn requested that he be permitted to take an independent test, but hospital personnel refused to do so.  Erickson provided Kuehn with a telephone to arrange for an independent test, but Kuehn called his attorney instead.  Kuehn was not processed and released until 4:30 or 5:00 p.m., and he and his attorney agreed that it was too late to get an independent test.

Erickson testified that he sealed the blood-test kit and delivered it to his district office.  The sample was received by the Bureau of Criminal Apprehension (BCA) on July 1, 2014, and analyzed on July 8 and 9.  Until the BCA received the sample, it was not refrigerated, but the blood-testing vial contained preservatives that prevent most degradation by heat.

Kuehn's expert, Thomas Burr, testified that many things could affect the accuracy of the testing, including Kuehn's diabetes, exposure to heat, discrepancies in the amount of preservatives in the blood-test kits, and contamination by the yeast Candida albicans,

---

[1] Kuehn's expert testified that an interference error means that acetone was present, which impedes successful testing.  Kuehn is a diabetic, and diabetics produce acetone.  Erickson testified that it indicated that the machine was detecting something other than or in addition to ethyl alcohol.

which can elevate alcohol concentration in unrefrigerated samples. Burr did not testify that any of these factors actually affected Kuehn's test results, but speculated about the effect such factors could have on a blood sample. Burr also stated that the first of the two BCA gas chromatograph analyses was invalid because it was not "resolved" and that in order to have a scientifically valid result, there must be two valid, reliable, and separate studies.

The commissioner presented its rebuttal expert witness, Vanessa Perez, who conducted the BCA analyses of Kuehn's sample. Perez noted that the sample was refrigerated after it arrived at the BCA, and the preservatives in the blood-collecting kits prevented fermentation from heat. She observed no irregularities during the testing of the sample. Perez analyzed the sample on two different days and on two different gas chromatograph columns. Tests are run on different columns because "[e]ach has its own chemistry which separates the volatiles differently. And it is done on two different columns to ensure identification of ethanol, as well as the reliability of the result." The results indicated that Kuehn had an alcohol concentration of 0.1551 or 0.1581. Perez explained that the different peaks on the printed results indicated the presence of other compounds, including the presence of acetone, and that they were not unusual for someone with an underlying health problem like Kuehn, who is diabetic. But she also testified that the presence of these other compounds does not affect the ultimate ethyl-alcohol result. Perez affirmed that the computer software corrects for non-resolution, and does so by slightly lowering the ethyl-alcohol concentration. She stated that heat can degrade a blood sample, but there must also be some sort of bacteria or impurity, and the

4

stabilizing agent slows any breakdown. The BCA is not concerned about possible Candida albicans contamination because it is relatively rare and the subject would most likely be hospitalized.

The district court issued an order sustaining the license revocation. Kuehn appeals from this order.

## D E C I S I O N

## I.

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. A warrantless search or seizure is generally unreasonable unless if falls within a recognized exception to the warrant requirement. *State v. Lemert*, 843 N.W.2d 227, 230 (Minn. 2014). But a peace officer is permitted to make a brief investigatory traffic stop when the officer observes even an "insignificant" violation of traffic law. *State v. Anderson*, 683 N.W.2d 818, 823 (Minn. 2004). We review the district court's determination of the legality of an investigatory traffic stop and questions of reasonable suspicion as questions of law subject to de novo review. *Wilkes v. Comm'r of Pub. Safety*, 777 N.W.2d 239, 242-43 (Minn. App. 2010). We review findings of fact for clear error. *Id.* at 243.

Kuehn does not contest the initial stop for speeding and possible expired registration, but rather argues that Erickson had no basis for expanding the stop. "The legal test for continuing detention is the same as that for the initial stop. A brief investigatory stop requires only reasonable suspicion of criminal activity, rather than probable cause. The factual basis required to support a stop is minimal, and an actual

5

violation is not necessary." *State v. Lopez*, 631 N.W.2d 810, 814 (Minn. App. 2001) (citation and quotations omitted), *review denied* (Minn. Sept. 25, 2001). When the original suspicion justifying the stop is dispelled, a police officer may not expand a stop without additional suspicion of criminal activity. *State v. Shellito*, 594 N.W.2d 182, 186 (Minn. App. 1999). An officer may expand the stop only "if the officer has reasonable, articulable suspicion of . . . other illegal activity." *State v. Wiegand*, 645 N.W.2d 125, 135 (Minn. 2002). The reasonableness of a stop is tied not only to its duration but also to its scope. *Id.* at 136.

The district court found that (1) Erickson returned to Kuehn's car to give him a speeding ticket and to ask him about his registration because Kuehn had said it was expired but Erickson discovered it was not; (2) Erickson also noted that Kuehn had four prior DWI convictions; (3) during this second conversation, Erickson noted that Kuehn had bloodshot and watery eyes and detected a faint odor of alcohol; and (4) field sobriety testing and a PBT confirmed Erickson's suspicions and provided a basis for arrest.

Kuehn argues that Erickson should have simply ticketed him for speeding once he realized that the car's registration was valid, and suggests that Erickson looked at him more closely once he realized that Kuehn had prior DWI convictions. The supreme court ruled in *State v. Henning* that a police officer does not have a reasonable, articulable suspicion of criminal activity that provides a basis for an investigative stop based solely on the fact that a car has specialized-series license plates.[2] 666 N.W.2d 379, 384-85

---

[2] These license plates are issued under certain conditions when a driver, owner of a motor vehicle, or a household member has restricted or revoked driving privileges because of

6

(Minn. 2003). Even though such license plates provide a generalized suspicion that a person without driving privileges may be driving, it is insufficient to create individualized suspicion of criminal activity. *Id.* at 385. Under this reasoning, Erickson could not require Kuehn to perform field sobriety tests based on his driving record. But Erickson testified that he detected other indicia of impairment during his conversation with Kuehn that permitted expansion of the stop, and the district court found Erickson's testimony credible. *See Snyder v. Comm'r of Pub. Safety*, 744 N.W.2d 19, 22 (Minn. App. 2008) (stating that in implied-consent proceeding appellate court must give due regard to district court's assessment of credibility).

Because the factual basis required to support a stop or expansion of a stop is minimal, no actual violation is necessary, and Erickson provided a basis for his reasonable suspicion of criminal activity, we conclude that the expansion of the stop in this case was permissible. *See Lopez*, 631 N.W.2d at 814.

## II.

Kuehn argues that he was prevented from exercising his right to an independent test. Minn. Stat. § 169A.51, subd. 7(b) (2012) states that

> [t]he person tested has the right to have someone of the person's own choosing administer a chemical test or tests in addition to any administered at the direction of a peace officer; provided, that the additional test sample on behalf of the person is obtained at the place where the person is in custody, after the test administered at the direction of a peace officer, and at no expense to the state. The failure or inability to obtain an additional test or tests by a person does not preclude the

impaired-driving convictions. *See* Minn. Stat. §§ 168.041, subd. 6, 169A.60, subd. 13 (2014).

admission in evidence of the test taken at the direction of a peace officer unless the additional test was prevented or denied by the peace officer.

"Whether an officer unlawfully prevented or denied an additional test involves both questions of law and fact." *Poeschel v. Comm'r of Pub. Safety*, 871 N.W.2d 39, 43 (Minn. App. 2015). We review the district court's findings of fact for clear error, but determine whether the driver's right to an independent test was violated as a question of law subject to de novo review. *Id.*

This court has drawn a distinction between a police officer failing to assist a person seeking an independent test and an officer's active hampering an attempt to arrange a test. *Haveri v. Comm'r of Pub. Safety*, 552 N.W.2d 762, 765 (Minn. App. 1996), *review denied* (Minn. Oct. 29, 1996). An officer's sole duty is to allow the defendant to use a telephone; he need not make arrangements, furnish supplies, or transport the defendant for purposes of obtaining a test. *Id.* Here, the hospital refused to draw a second blood test, but Erickson provided Kuehn with a telephone and phone book; Erickson chose to call his attorney instead of arranging for a second test. Under these circumstances, Erickson did not interfere with Kuehn's right to arrange for an independent test.

## III.

Kuehn argues that the commissioner failed to sustain the burden of proving that the blood-test results were valid, accurate, and reliable. The commissioner, as the proponent of a chemical test, has the burden to establish a prima facie case that the test was reliable and appropriate procedures were followed to ensure reliability. *Genung v.*

8

*Comm'r of Pub. Safety*, 589 N.W.2d 311, 313 (Minn. App. 1999), *review denied* (Minn. May 18, 1999). The burden then shifts to the party opposing admission of chemical testing results to demonstrate why the test is not reliable or accurate. *Id.* The commissioner bears the ultimate burden of persuasion. *Id.* This court reviews the district court's findings for clear error, and its conclusions de novo. *Id.*

A person challenging a driver's-license revocation is limited to asserting the issues set forth in Minn. Stat. § 169A.53, subd. 3(b) (2012).[3] One of the issues is whether the testing method is valid and reliable, and whether the test results were accurately evaluated. *Id.*, subd. 3(b)(10). But "arguing that something *might* have occurred is mere speculation and insufficient [to rebut chemical testing results] unless supported by additional evidence. [An appellate court] requires that the driver establish a relationship between the alleged error and the validity of the results." *Kramer v. Comm'r of Pub. Safety*, 706 N.W.2d 231, 237 (Minn. App. 2005) (citation omitted). For example, a driver could allege that the breathalyzer gave a false reading because of a low chemical level, but that alone would not render the test unreliable; the driver must still show that the low chemical level would exaggerate the test results. *Id.* at 236.

In *Pasek v. Comm'r of Pub. Safety*, 383 N.W.2d 1, 3-4 (Minn. App. 1986), this court rejected a challenge to a breathalyzer result obtained while the defendant had chewing tobacco in his mouth during the test. This court commented that when "the opponent [of a test] does rebut the prima facie case, the judge must rule upon the

---

[3] This statute was amended to include the defense of necessity. 2015 Minn. Laws ch. 65, art. 6, § 10, at 526-27 (effective July 1, 2015).

9

admissibility in the light of the entire evidence.  The credibility of the test may be preserved with an explanation of the deviation." *Id.* at 4 (citation and quotation omitted). This court concluded that the test results were acceptable; the defendant merely speculated that the chewing tobacco could affect the results, without producing evidence to contradict the officer's testimony that tobacco would not affect the results.  *Id.*

Burr, Kuehn's expert, raised three issues regarding validity of the test results: (1) failure to fully resolve one of two tests; (2) degradation of sample through exposure to heat; and (3) exposure to Candida albicans.  Perez of the BCA testified that the test was fully resolved; the various peaks showed the presence of other compounds, including acetone, but the computer software corrects for this.  The district court found that Kuehn "presented no mathematic or scientific theory under which the software's calculations could be considered flawed."

Perez testified that heat can affect a sample, but the preservative in the blood-test kit protects the sample.  There was no definitive testimony about the exposure to heat; Erickson may have left the sample in his squad car when he returned Kuehn to the jail; it appears that the sample sat at room temperature at the State Patrol office; and it could have been exposed to heat when it was mailed to the BCA.  But, again, this is speculation.  There is no testimony establishing how long and at what temperature a sample would have to be exposed before it would degrade despite the preservative.

Finally, Burr testified that the yeast Candida albicans could cause the sample to ferment, but there was no indication that the sample was exposed to this yeast.  This is

10

also merely speculative.  Kuehn failed to sustain his burden of demonstrating that the test results were not accurate or reliable.

## IV.

Kuehn argues that the warrantless search and seizure of his blood was constitutionally defective because he did not freely and voluntarily consent to the blood test.  The supreme court held that although chemical testing for impairment is a search for which a warrant is required, a defendant may freely and voluntarily consent to a warrantless chemical test.  *State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013).  The state must demonstrate by a preponderance of the evidence that the defendant voluntarily consented based on the totality of the circumstances.  *Id.*  The supreme court concluded that consent can be voluntary even when a defendant is read the implied-consent advisory and is told that refusing to take a test is a crime because police may not administer a test following a refusal.  *Id.* at 569.  In *Missouri v. McNeely*, the United States Supreme Court commented on the ability of states to enforce drunk-driving laws through the use of implied-consent proceedings.  133 S. Ct. 1552, 1566-67 (2013).

Here, Erickson read the implied-consent advisory and permitted Kuehn to talk to an attorney, who advised Kuehn to take a breath test.  When the breath test could not be completed, Kuehn talked to his attorney again, and requested a blood test.  Erickson took him to the hospital for a blood test.  There are no facts that support Kuehn's contention that he did not voluntarily consent to the test.

Kuehn argues, based on this court's opinion in *State v. Trahan*, 870 N.W.2d 396 (Minn. App. 2015), *review granted* (Minn. Nov. 25, 2015), that the implied-consent

advisory, "including the demand for a blood test under penalty of criminal prosecution for refusal, violates [his] rights under the Fourth Amendment, and the constitutional guarantee of due process of law."

In *Trahan*, this court concluded that the exceptions to the warrant requirement of search incident to arrest or exigent circumstances did not apply when a driver has refused to consent to chemical testing. *Id*. at 401-03. Trahan had provided a urine sample, but it appeared he had diluted it with tap water. *Id.* at 399 n.2. He then refused the blood test. *Id.* at 399. Trahan argued that the test-refusal statute violated his due-process rights to refuse to submit to a warrantless search. *Id.* at 403. This court subjected the test-refusal statute to strict scrutiny because a fundamental right was implicated and concluded that it was "not precisely tailored to serve [a] compelling state interest," and was therefore unconstitutional. *Id.* at 404. This court reached a similar conclusion in *State v. Thompson*, 873 N.W.2d 873, 880 (Minn. App. 2015), *petition for review granted* (Minn. Feb. 24, 2016), in which the defendant refused to submit to a urine test. And in *Stevens v. Comm'r of Pub. Safety*, 850 N.W.2d 717 (Minn. App. 2014), this court rejected a driver's challenge to the constitutionality of the test-refusal statute as it applies in implied-consent license revocation proceedings.

Unlike in *Trahan* and *Thompson*, Kuehn was not charged with test refusal and his license was not revoked because he refused to submit to a test; rather, his license was revoked after he consented to a warrantless search. While Kuehn argues, "Under *Trahan*, refusal to submit to a warrantless blood test is NOT a crime," Kuehn was not charged with refusal. Consent is an exception to the warrant requirement. *Brooks*, 838 N.W.2d at

12

Under the totality of the circumstances, Kuehn freely and voluntarily consented to chemical testing. We therefore affirm the commissioner's order sustaining the revocation of Kuehn's driver's license.

**Affirmed.**