**STATE of Minnesota, Respondent,**

v.

**Scott Evan DAVIS, Appellant.**

No. A05–857.

Supreme Court of Minnesota.

May 24, 2007.

Derek A. Patrin, Meaney & Patrin, P.A., Hopkins, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, State of Minnesota, St. Paul, MN, James C. Backstrom, Dakota County Attorney, Vance B. Grannis, III, Assistant County Attorney, Hastings, MN, for Respondent.

## OPINION

GILDEA, Justice.

Based on evidence the police discovered during a search of his apartment, appellant Scott Evan Davis was found guilty of possession of controlled substances and drug paraphernalia. Davis contends that the search violated his rights under the Minnesota Constitution. He argues that the evidence seized from his apartment should have been suppressed because the search warrant was supported in part by a dog sniff conducted outside his apartment door, and the police did not have either probable cause or reasonable suspicion to conduct the dog sniff. The district court denied Davis's motion to suppress the evidence, and the court of appeals affirmed. We granted Davis's petition for review and now affirm.

On August 27, 2004, an officer with the Burnsville Police Department obtained a search warrant for Davis's apartment. The officer included the following facts in the search warrant application: (1) an apartment complex employee told the officer that she or he [1] had received information from maintenance employees at the complex that they believed they had observed marijuana-growing lights inside Davis's apartment and that Davis would not let them come into his apartment to investigate or repair a possible water leak; (2) a dog, certified by the United States Police K–9 Association to detect the smell of drugs, alerted to the presence of a narcotic odor [2] in the first floor hallway of the apartment building at the threshold of Davis's apartment door; [3] and (3) a back-

1. The application for the search warrant indicates that the apartment-complex employee wished to remain anonymous for her or his personal safety.

2. There is no indication that apartment complex employees received complaints of odors emanating from Davis's apartment. The court of appeals was apparently mistaken in this regard. *State v. Davis,* 711 N.W.2d 841, 843 (Minn.App.2006).

3. The record does not include any information about how the police were able to enter the apartment building to conduct the dog sniff (i.e., whether management or another tenant admitted them, or whether they were

ground check revealed that Davis had a history of criminal activity. The district court issued the warrant, and police officers executed the warrant on August 31, 2004. The officers gained access to Davis's apartment with a key provided by apartment-complex management. In Davis's apartment, the officers discovered various items of contraband.

Davis was charged with two counts of controlled substance crimes in the fifth degree and one count of possession of drug paraphernalia.[4] On February 25, 2005, Davis filed a motion to suppress the evidence seized from his apartment and to dismiss the charges against him, arguing that the search violated his rights under the Fourth Amendment and the Minnesota Constitution. No testimony was offered in connection with Davis's motion. The parties agreed instead to submit the question to the court based on the application for search warrant and supporting affidavit, the police report prepared following execution of the search warrant, and legal memoranda. Following oral argument, the district court denied Davis's motion. The court concluded that the police needed reasonable, articulable suspicion to use the narcotics-detection dog and that the standard was met based on the information provided to police by the apartment complex employees. The court of appeals affirmed.

## I.

The Minnesota Constitution[5] prohibits "unreasonable searches and seizures." Minn. Const. art. I, § 10.[6] The first step in an analysis under section 10 usually involves a determination of whether the police activity at issue constitutes a search or a seizure for purposes of the Minnesota Constitution. *State v. Carter,* 697 N.W.2d 199, 210–11 (Minn.2005). That analysis is unnecessary in this case. In *Carter* we decided that the use of a narcotics-detection dog outside a storage unit is a search for purposes of the Minnesota Constitution. *Carter,* 697 N.W.2d at 211. The state has not asked us to reconsider our analysis in *Carter* and it has not argued that the expectation of privacy at issue in this case requires a different conclusion. Indeed, the state does not even argue that the dog sniff in this case was not a search.[7] We therefore turn to the next step in the analysis, which requires us to examine the level of suspicion (probable cause or reasonable, articulable suspicion) necessary to sustain as constitutional the use of a narcotics-detection dog in the common hallway of an apartment building. *See id.* The district court and the court of appeals concluded that a reasonable, articulable suspicion was necessary and that probable cause was not required in this circumstance. We review this constitutional

---

able to walk in directly without being admitted).

**4.** A charge of possession of a pistol without a permit was dismissed.

**5.** At oral argument, Davis made clear that he was no longer arguing that the dog sniff was a search for purposes of the Fourth Amendment. Accordingly, that question is not before us.

**6.** The full text of the constitutional provision is as follows:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

Minn. Const. art. I, § 10.

**7.** Instead, the state argues that reasonable, articulable suspicion is the standard that should govern the use of the dog in this case.

question de novo. *See State v. Burbach,* 706 N.W.2d 484, 487 (Minn.2005).

We have addressed the level of suspicion necessary to sustain the use of a narcotics-detection dog in two recent cases. *See Carter,* 697 N.W.2d at 211–12; *State v. Wiegand,* 645 N.W.2d 125, 133–35 (Minn. 2002). Because the parties' arguments are premised on the holdings of *Carter* and *Wiegand,* we turn first to a discussion of these cases.

In *Wiegand,* the police walked a narcotics-detection dog around the exterior of a motor vehicle that had been stopped because of a burned-out headlight. 645 N.W.2d at 128–29. Because there was "some expectation of privacy in an automobile," and a dog sniff intrudes upon this privacy interest "to some degree," we held that the police "cannot conduct a narcotics-detection dog sniff around a motor vehicle stopped for a routine equipment violation without some level of suspicion of illegal activity." *Id.* at 134. We concluded that principles from *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), were appropriately applied to the context of a motor vehicle stop, and we said that the *Terry* principles authorized the balancing of the level of intrusiveness of the use of the dog "against the importance of the governmental interest at stake." *Wiegand,* 645 N.W.2d at 133–34. Based on this balancing, we adopted the reasonable, articulable suspicion standard as necessary to sustain the use of the dog sniff in *Wiegand. Id.* at 137.[8]

We also employed the reasonable, articulable suspicion standard in *Carter.* 697 N.W.2d at 211. That case involved the use of a narcotics-detection dog around the exterior of a private storage unit located within a fenced self-storage facility. *Id.* at 202–03. We concluded that the dog sniff was a search for purposes of the Minnesota Constitution, even though we had concluded it was not a search for purposes of the United States Constitution. *Carter,* 697 N.W.2d at 209, 211. We reached this conclusion because we found that the expectation of privacy at issue was greater under our constitution than it had been determined to be under the Fourth Amendment. *Id.* at 210. Having concluded that the use of the dog was a search under the Minnesota Constitution, we then examined what level of suspicion was necessary to sustain the search under our constitution. *Id.* at 211–12. We concluded that the reasonable, articulable suspicion standard struck the appropriate "middle ground" between the individual's privacy interest and the government's interest in using effective law enforcement tools. *Id.* (internal quotation marks omitted).

On the basis of *Wiegand* and *Carter,* Davis asks us to find that the Minnesota Constitution requires probable cause to sustain the use of the narcotics-detection dog in the hallway outside his apartment. Davis contends that the dog sniff was a search "inside" his private residence and that his expectation of privacy in his residence is greater than the expectation of

---

8. In *Wiegand,* we said that the reasoning of the Supreme Court in *Kyllo* "suggests that a dog sniff of a home might lead a court to conclude that a search requiring probable cause took place." *Wiegand,* 645 N.W.2d at 130 (discussing *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). But *Wiegand* was decided before the Supreme Court clarified the reach of *Kyllo* in the context of dog sniffs in *Illinois v. Caballes,* 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" (citation omitted)). *See Carter,* 697 N.W.2d at 208 (discussing *Caballes* and *Kyllo*).

privacy found to exist in either *Wiegand* or *Carter*. Accordingly, Davis contends the dog sniff in this case must be supported by probable cause to survive a constitutional challenge.[9]

■ The Supreme Court has cautioned against using a "mechanical interpretation" of the prohibition against unreasonable searches. *Kyllo v. United States*, 533 U.S. 27, 35, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). We have also recognized that what constitutes an unreasonable search must be assessed based on the facts of each particular case. *State v. Olson*, 271 Minn. 50, 57, 135 N.W.2d 181, 186 (1965). As part of this particularized inquiry, Minnesota courts have balanced "the nature and significance of the intrusion on the individual's privacy interests * * * against the gravity of the public concerns it serves and the degree to which the conduct at issue advances the public interest." *State v. Larsen*, 650 N.W.2d 144, 148, 150 (Minn. 2002) (ruling that the warrantless search of a fish house that was not supported by probable cause was unreasonable). We turn now to that individualized analysis.

## II.

■ The Minnesota Constitution protects citizens against *unreasonable* government intrusions upon areas where there is a legitimate expectation of privacy. *See Carter*, 697 N.W.2d at 214. Davis has the burden of showing that the dog sniff intruded upon an area in which he had a legitimate expectation of privacy. *See State v. Gail*, 713 N.W.2d 851, 859–60 (Minn.2006) (concluding that the defendant "has the burden of establishing that his rights under Article I, Section 10 of the Minnesota Constitution were violated"). There is no question that a person has a legitimate expectation of privacy inside her or his residence. *See Carter*, 697 N.W.2d at 208 (noting that a person's expectations of privacy in a home "are most heightened"). The issue in this case is whether the level of intrusion upon Davis's privacy interest—through the police walking a narcotics-detection dog outside his residence in the common hallway—is sufficiently great that it can be said to render the search "unreasonable" under the Minnesota Constitution unless it is supported by probable cause.

If the police enter a place where a person has a legitimate expectation of privacy there is of course a great intrusion upon that privacy interest. But in this case the

---

9. Davis also points to *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985), in support of his probable cause argument. In *Thomas*, the Second Circuit held that "[b]ecause of defendant['s] * * * heightened expectation of privacy inside his dwelling, the canine sniff at his [apartment] door constituted a search" under the Fourth Amendment. *Id.* at 1367. *Thomas* dealt with Federal constitutional law, and has been roundly criticized. *See, e.g., United States v. Hogan*, 122 F.Supp.2d 358, 369 (E.D.N.Y.2000) ("*Thomas* appears never to have been followed by any court outside [the Second] Circuit * * *."); *People v. Dunn*, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1058 n. 4 (1990) ("[W]e find the *Thomas* court's holding to be wrong as a matter of Federal constitutional law * * *."). State courts have, however, cited *Thomas* in support of their conclusions that police must have a reasonable, articulable suspicion (not probable cause) to conduct a dog sniff outside the door of an apartment. *See, e.g., State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805, 817 (1999) (agreeing with *Thomas* that "an individual's Fourth Amendment privacy interests may extend in a limited manner * * * [into] the hallway outside an apartment," and concluding that "a canine sniff under these circumstances must be based on no less than reasonable, articulable suspicion"); *Dunn*, 563 N.Y.S.2d 388, 564 N.E.2d at 1058 & n. 4 (finding *Thomas* "persuasive in interpreting our State Constitution" and holding that a dog sniff may be conducted "provided that the police have a reasonable suspicion that a residence contains illicit contraband").

police did not enter the area in which Davis has the greatest expectation of privacy, his residence. Rather, the police were outside his residence in the common hallway. Davis presented no evidence in this case indicating that the police were not lawfully in the hallway or in the apartment building itself. *See Carter*, 697 N.W.2d at 212 (noting that police need to be lawfully present for a dog sniff to be constitutional). And Davis presented no evidence that he controlled access to the hallway, or that access to the hallway or to the apartment building itself was limited via a locked door or some other mechanism. In short, Davis has not shown that he had an expectation of privacy in the common hallway in addition to that expectation of privacy he had inside his residence.[10]

Rather than argue that he has a legitimate expectation of privacy in the hallway, Davis contends that his privacy interest *inside* his residence was intruded upon because the police conducted the dog sniff to detect something inside his residence. Davis relies on *Kyllo*, where the Supreme Court concluded that police use of a thermal-imaging device outside a home, but directed into the home, was a search for purposes of the Fourth Amendment. 533

U.S. at 29–30, 34–35, 121 S.Ct. 2038. Davis argues that just as the investigative tool in *Kyllo* was aimed at gathering information (heat-emitting lamps) about the inside of a residence, so too was the use of the narcotics-detection dog. Consistent with the rationale of *Kyllo*, Davis contends that the focus of our examination of the privacy interest should be on the inside of his residence.

As we noted in *Carter*, the homeowner's interest in the inside of his residence was intruded upon in *Kyllo* because the device at issue there was "capable of detecting lawful as well as unlawful activity" going on inside the residence. *Carter*, 697 N.W.2d at 208 (discussing *Illinois v. Caballes*, 543 U.S. 405, 409–10, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), as having "clarified that the relevant inquiry is whether the investigative device used is capable of detecting lawful as well as unlawful activity inside a place that otherwise carries a legitimate expectation of privacy"). By contrast, Davis makes no claim that the dog used outside his apartment was capable of detecting more than simply the odor of illegal narcotics emanating from the inside of his residence.[11] As the Supreme Court noted in *United States v. Place*, a dog sniff "does not expose noncontraband

---

**10.** Davis has made no argument that in order to conduct the dog sniff, the police intruded upon the curtilage of his home. *See Garza v. State*, 632 N.W.2d 633, 639 (Minn.2001) ("A dwelling's curtilage is generally the area so immediately and intimately connected to the home that within it, a resident's reasonable expectation of privacy should be respected."). Accordingly, we express no opinion about what level of suspicion is required to walk a narcotics-detection dog in an area found to be within the curtilage. We also express no opinion about what standard would be required if a defendant met her burden of proving that she has a reasonable expectation of privacy in the apartment building hallway.

**11.** The dissent apparently would take judicial notice of a claimed fallibility of narcotics-

detection dogs. We recently rejected such a categorical rule and concluded that the reliability of narcotics-detection dogs should be assessed on a case-by-case basis. *See Jacobson v. $55,900 in U.S. Currency*, 728 N.W.2d 510, 529 (Minn.2007). If, as the dissent suggests, the dog utilized in this case was not reliable, that is an issue that Davis should have raised in the district court. One of the cases the dissent cites recognizes that this is the correct approach. *See United States v. Limares*, 269 F.3d 794, 797 (7th Cir.2001) (discussing evidence received by the district court on the issue of reliability of the dog and upholding as not clearly erroneous the court's conclusion that the dog was reliable).

items that otherwise would remain hidden from public view" but "discloses only the presence or absence of narcotics." 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (noting that the "limited disclosure" of a dog sniff "ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods"). Indeed, the Court has described a dog sniff as *sui generis* because there is "no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.*; *see also Wiegand*, 645 N.W.2d at 134 (noting that "a dog trained only in narcotics detection would alert only to narcotics and would not alert to lawful items or even to a weapon or stolen goods"). As noted in *Carter*, the only intrusion on the privacy interest that occurs through use of the dog occurs because the dog can sniff what the public cannot. *See Carter*, 697 N.W.2d at 211; *see also Wiegand*, 645 N.W.2d at 134. This intrusion, however, is minimal.[12]

Davis argues that the level of intrusion must be greater in this case than that recognized in *Carter* because here the police walked the dog down the hallway of an apartment building, not outside a storage unit. But the record contains no evidence justifying a conclusion that the intrusion in this case is any greater than the intrusion at issue in *Carter*.

In *Carter*, we noted that the defendant's storage unit was "large enough to contain a significant number of personal items and even to conduct some personal activities." 697 N.W.2d at 210–11. We concluded that although a person has an expectation of privacy in a storage unit, "a renter of [a storage] unit must expect that other people will lawfully be in the area outside the unit and will be able to smell plain odors emanating from the unit." *Id.* at 211. The same can be said of an apartment hallway. A tenant must expect that other people will lawfully be in the hallway and be able to smell odors emanating into the public space. Just as in *Carter*, the police walked the dog in an area that on this record we must treat as accessible to the public. We conclude that while Davis's expectation of privacy inside his apartment may be greater than the expectation of privacy inside a storage unit, the level of intrusion upon that interest cannot be characterized as any greater than the minimal intrusion we found to exist in *Carter*.

■ Because the intrusion upon Davis's expectation of privacy was minimal, it is appropriate to consider, as we did in *Carter*, the government's interest in order to ascertain the level of suspicion nec-

---

**12.** The dissent suggests that the fact that the police did not actually enter Davis's apartment is not dispositive of the issue presented here. We agree that the analysis under *Carter* does not end with a finding that the police did not take the dog inside the apartment. If that were our rule, the analysis would end with our conclusion that Davis did not prove that he had a legitimate expectation of privacy in the apartment hallway. *See Gail*, 713 N.W.2d at 860 (concluding that because defendant did not have a legitimate expectation of privacy in cell phone records, his constitutional rights were not violated through the police's seizure of these records). But *Carter* requires more.

In *Carter*, we recognized that the dog was sensing for odor "emanating from the unit." 697 N.W.2d at 211. Similarly here the dog is sniffing for illegal drugs that are located inside Davis's apartment but that emit an odor that the dog is capable of detecting when the dog is walked outside the unit. Our analysis in *Carter* focused not only on where the police were, but also examined the location from which the police were seeking information and how intrusive the mechanism was that was used to help the police search. *See id.* Consistent with our precedent, we follow the same analysis here.

essary to sustain the use of a dog sniff. 697 N.W.2d at 211–12. Our reliance on the government's interest is supported by *Place*. 462 U.S. at 703, 103 S.Ct. 2637. In *Place*, the Court found that the government's interest was appropriately considered within the context of the seizure of luggage which was then subjected to a dog sniff. *Id.* The Court recognized that where the "nature and quality" of the government action is "minimally intrusive" upon the individual's interests, the interests of effective law enforcement can support finding that a seizure is reasonable under the Fourth Amendment even though it was not premised on probable cause. *See Place*, 462 U.S. at 703, 103 S.Ct. 2637.[13]

Other states have also noted that it is appropriate to examine the government's interest when examining the reasonableness of the use of narcotics-detection dogs under their state constitutions. *See People v. Dunn*, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1058 (1990) (noting that the use of narcotics-detection dogs provides "significant utility to law enforcement authorities"); *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74, 79 (1987) (noting that "much of the law enforcement utility of such dogs would be lost if full blown warrant procedures were required before a canine sniff could be used"). We likewise believe that it is ap-propriate to consider the government interest in this case of minimal intrusion in determining the level of suspicion necessary to sustain the warrantless use of a narcotics-detection dog under the Minnesota Constitution.[14]

We recognized in *Carter* that "the government has a significant interest" in using narcotics-detection dogs in combating drug crimes and that the "public's interest in effective criminal investigations" was served through the use of this investigative tool. *See* 697 N.W.2d at 211–12. Davis offers no argument that the government interest at stake here is not just as significant.

We held in *Carter* that reasonable, articulable suspicion struck the appropriate balance between the privacy right of individuals and the government (and society's) interest in effective law enforcement. 697 N.W.2d at 211–12. We conclude that the same result is warranted here.[15] When we balance the minimal intrusion on Davis's privacy interests inside his residence against the governmental interest in the use of narcotics-detection dogs as an investigative tool to combat drug crime, we conclude that the police needed a reasonable, articulable suspicion to walk a narcotics-detection dog down the common hallway outside Davis's apartment. Use of the reasonable suspicion standard is con-

13. The Court ultimately held that the seizure of the luggage was not reasonable because, by transporting the luggage to a different airport and holding it for more than 90 minutes before it was subjected to the dog sniff, the police "exceeded the permissible limits of a *Terry*-type investigative stop." 462 U.S. at 709–10, 103 S.Ct. 2637.

14. Our holding is not meant to indicate that taking the government's interest into account is appropriate in all cases. But where the level of the intrusion is minimal, as we have found it to be here, we believe it is appropriate to consider the government's interest.

15. The dissent finds it "unfortunate[]" that we applied *Terry* balancing principles in *Carter* because the circumstances of that case did not require "necessarily swift" action on the part of the police. We did not cite *Terry* in our analysis in *Carter* but we agree with the dissent that the test we adopted in *Carter* is consistent with *Terry* principles. *Carter*, 697 N.W.2d at 211 (applying balancing test). *Carter* invoked the balancing principles in the specific context at issue here and we are not free to depart from this precedent. *See, e.g., State v. Lee*, 706 N.W.2d 491, 494 (Minn.2005) (discussing importance of stare decisis).

sistent with this court's goals of preserving the "law enforcement utility" of narcotics-detection dogs and ensuring that the police are not allowed to use narcotics-detection dogs "at random and without reason." *Id.* at 211 (internal quotation marks omitted).[16]

Based on the record before us, we cannot conclude that the balance we struck in *Carter* tips differently in this case. Accordingly, we hold that the police needed only reasonable, articulable suspicion that Davis was engaged in illegal drug activity, rather than probable cause, to conduct the dog sniff in the common hallway outside Davis's apartment door.

### III.

■ Having concluded that reasonable suspicion is the appropriate standard in this case, we next examine whether the police had reasonable, articulable suspicion before using the narcotics-detection dog outside Davis's apartment. The district court found that the police had a reasonable, articulable suspicion. We review the court's determination de novo. *See State v. Britton,* 604 N.W.2d 84, 87 (Minn.2000).

■ Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. The requisite showing is "not

high." *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). We have said that reasonable suspicion requires "something more than an unarticulated hunch, [and] that the officer must be able to point to something that objectively supports the suspicion at issue." *State v. Wasson,* 615 N.W.2d 316, 320 (Minn.2000). We consider the totality of the circumstances when determining whether reasonable suspicion exists, and seemingly innocent factors may weigh into the analysis. *State v. Martinson,* 581 N.W.2d 846, 852 (Minn.1998).

■ The state relies on two pieces of information from a private citizen informant in order to support a finding that the police had a reasonable, articulable suspicion in this case. First, the informant told the police that maintenance employees believed they had observed "marijuana-growing lights" that "were activated while they were inside" Davis's apartment. Second, the informant told police that there was a water leak at Davis's apartment but that Davis would not "let the maintenance employees come inside of his apartment to repair or investigate the possible water leak."

■ We presume that tips from private citizen informants are reliable. *Marben v. State Dep't of Pub. Safety,* 294

---

**16.** Application of the reasonable suspicion standard is consistent with what other state courts have done when confronting the warrantless use of narcotics-detection dogs in hallways of apartment buildings. *See, e.g., Ortiz,* 600 N.W.2d at 817 (concluding that an individual has a "legitimate expectation of some measure of privacy" in an apartment hallway, and therefore a dog sniff outside an apartment door requires reasonable suspicion rather than probable cause); *Dunn,* 563 N.Y.S.2d 388, 564 N.E.2d at 1058 (discussing a dog sniff at the defendant's apartment door and concluding that "[g]iven the uniquely discriminate and nonintrusive nature of [a dog

sniff as] an investigative device, as well as its significant utility to law enforcement authorities," a dog sniff "may be used without a warrant or probable cause, provided that the police have a reasonable suspicion that a residence contains illicit contraband"); *see also Fitzgerald v. State,* 384 Md. 484, 864 A.2d 1006, 1022–23 (2004) (refusing to decide whether the Maryland Constitution "deems a dog sniff a search, because even if it did, it would require only reasonable suspicion," and noting that this is the conclusion reached by "almost all" of the states that have decided that a dog sniff is a search for purposes of their state constitutions).

N.W.2d 697, 699 (Minn.1980); *see also State v. Jones*, 678 N.W.2d 1, 11 (Minn. 2004). This is particularly the case when informants give information about their identity so that the police can locate them if necessary. *See City of Minnetonka v. Shepherd*, 420 N.W.2d 887, 888, 890 (Minn. 1988) (holding that a tip from an informant identifying himself as "a station attendant at the Q Petroleum Station in Minnetonka" that he had "observed an intoxicated driver leave the gas station" in a vehicle he identified by color and license plate was sufficient to give police reasonable suspicion that the driver was intoxicated); *see also State v. Maynard*, 783 So.2d 226, 230 (Fla.2001) ("[A]n informant's actual name need not be known so long as her identity is readily discoverable." (internal quotation marks omitted)); *cf. Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (noting that tips from informants whose reputation can be assessed and who can be held responsible if the allegations are fabricated are more reliable than tips from an anonymous informant). Just as in *Shepherd*, the informant here reported to the police where she or he worked (at the apartment complex) and gave the police specific information. In particular, the police were told that maintenance employees "believed they had observed marijuana-growing lights" that were "activated" in Davis's apartment. Davis stipulated to the contents of the search warrant application, and did not contest the characterization of the lights as "marijuana-growing lights." [17] Also, Davis would not permit the employees to come inside his apartment to repair or investigate a water leak.

The two facts reported by the apartment complex employee gave police something more than an unarticulated hunch. It was reasonable for police to infer from these facts that Davis might be growing marijuana in his apartment. *Cf. United States v. Williams*, 3 F.3d 69, 70–71 (3d Cir.1993) (finding *probable cause* to search hotel room where a private-citizen "anonymous" informant who worked as a housekeeper at a hotel told police that she had seen small plastic baggies and cigarette rolling papers in a hotel room, and she was refused admittance to clean the room until the defendant had removed a box of unknown content). We hold that the police had a reasonable suspicion that there was illegal drug activity inside Davis's apartment.

Our decision in *Carter* supports our conclusion. In *Carter*, the manager of the storage unit facility reported only that the defendant rented two units at the facility and sometimes visited several times a day. 697 N.W.2d at 203. There was no indication in *Carter* that management believed the defendant was using drugs, or doing anything illegal. By contrast, it is reasonable to infer from the apartment complex employees' description of the lights that they suspected that Davis was growing marijuana, as the district court found in this case.

Because the police had a reasonable suspicion that Davis had illegal drugs inside his apartment, Davis's rights under the Minnesota Constitution were not violated when the police conducted a dog sniff outside his apartment door.

Affirmed.

ANDERSON, PAUL H., Justice (concurring).

I agree with the result reached by the majority, but I write separately to high-

---

17. It is undisputed that growing lights are often used by people to grow marijuana. *See, e.g., State v. Loranger*, 250 Wis.2d 198, 640 N.W.2d 555, 562 (Ct.App.2001) (acknowl-edging that the defendant's above-average use of energy for lights used to grow marijuana was a factor the court could consider to support a finding of probable cause).

light my underlying concerns and reservations with respect to the extent to which dogs are used as an investigative tool.

As the majority opinion demonstrates, this case is all about the dog sniff and Davis's expectation of privacy inside his residence. The majority correctly notes that Davis has not demonstrated, and indeed makes no claim, that the dog used outside his apartment would alert to anything other than the odor of *illegal* narcotics *emanating from* the inside of his residence. In essence, all we have before us is that the dog used in this search was only capable of disclosing the presence or absence of illegal narcotics based upon odors in the hall that emanated from Davis's residence. Therefore, I find nothing improper about this search.

But, if faced with evidence that a dog can and will alert to legal activity in a residence based on odors emanating from that residence, I might well reach a different result. *See Kyllo v. United States,* 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (holding that use of thermal-imaging devices to gather information about heat in a home's interior is not removed from the scope of the Fourth Amendment and does constitute a search). Further, at this point, I am not prepared to adopt, either explicitly or implicitly, the Supreme Court's conclusion in *United States v. Place* that a dog sniff is *"sui generis"* because this investigative procedure is so limited that the only information obtained as a direct result of a dog sniff will be that of illegal activity. 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). I will wait to decide this issue until we are presented with a case that includes a more comprehensive record on the reliability of a particular dog sniff.

PAGE, Justice (dissenting).

I respectfully dissent. The court concludes that only a reasonable articulable suspicion was necessary before police used a canine to detect the odor of narcotics coming from Davis's apartment. Because I conclude that the dog sniff was a search of Davis's apartment, not the hallway outside of the apartment, I would require that police have probable cause, rather than merely reasonable suspicion, to conduct the dog sniff. I would therefore exclude the results of the dog sniff as a basis for the warrant used to enter Davis's apartment. Without the results of the dog sniff, police lacked probable cause to obtain the warrant to enter Davis's apartment. I would therefore reverse the court of appeals and remand to the district court with instructions to suppress the evidence discovered when police entered the apartment.

Davis argues that the use of the dog constituted a search. I agree. A search occurs whenever government agents intrude upon an area where a person has a reasonable expectation of privacy. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (citing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). Whether the dog sniff was a search therefore requires us to determine what it was that the dog sniffed: if it was an area in which Davis had a reasonable expectation of privacy, then it was indeed a search.

Davis argues that the dog sniff was a search of the inside of his apartment. In contrast, the state characterizes the dog as sniffing merely the "apartment hallway" or "the door of the apartment unit" or "the threshold of [Davis's] apartment," and emphasizes that the dog "is not smelling inside the apartment itself." The Supreme Court, first in *Katz,* and again in *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), has made it clear

that the definition of a "search" does not depend on such a "mechanical interpretation of the Fourth Amendment." *Kyllo,* 533 U.S. at 35, 121 S.Ct. 2038. In *Katz,* the government argued that the electronic listening device it had placed on the outside of a public telephone booth did not constitute a warrantless search because it "involved no physical penetration of the telephone booth." 389 U.S. at 352, 88 S.Ct. 507. The Court dismissed the government's argument with the observation that "the reach of [the Fourth] Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.* at 353, 88 S.Ct. 507. Similarly, in *Kyllo* the Court dismissed the government's argument that its use of thermal imaging did not constitute a search because it detected "only heat radiating from the external surface of the house." 533 U.S. at 35, 121 S.Ct. 2038 (internal quotation marks omitted). To the contrary, the Court noted, the thermal imager used in *Kyllo* "reveals the relative heat of various rooms in the house," and "there is no basis for saying it is not information regarding the interior of the home." *Id.* at 35 n. 2, 121 S.Ct. 2038. And, the Court announced that the definition of a "search" under the Fourth Amendment therefore included "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,'" at least where the technology in question is not in general public use. *Kyllo,* 533 U.S. at 34, 121 S.Ct. 2038.

Applying this definition makes clear that the use of the dog in this case was not only a search, it was a search of the interior of Davis's apartment. Although the state emphasizes that the dog was merely in the apartment hallway, police were not searching for narcotics in the hallway, and had

they found any (tucked beneath the carpet, for example), it would have been nothing more than a happy accident. Rather, the police were there to search for evidence of drugs in the apartments themselves, and particularly in Davis's apartment. And, because there was no odor of narcotics emanating from Davis's apartment that officers could themselves detect, they were doing so using "sense-enhancing technology * * * not in general public use," namely, a specially trained narcotics-sniffing dog. *Kyllo,* 533 U.S. at 34, 121 S.Ct. 2038. We should acknowledge that fact here, just as we (and I) should have acknowledged in *Carter* that police were using a dog sniff to search for evidence of drugs in the storage unit itself. *State v. Carter,* 697 N.W.2d 199, 208–09 (Minn.2005) (describing the dog sniff as "outside of a storage unit"); *id.* at 212 (Page, J., concurring specially (describing the dog sniff as "outside a storage unit")).

Because I conclude that this was a search for evidence of narcotics inside Davis's residence, I also conclude, consistent with the positions I took in *Wiegand* and in *Carter,* that probable cause was required. *State v. Wiegand,* 645 N.W.2d 125, 139 (Minn.2002) (Page, J., concurring and concurring specially); *Carter,* 697 N.W.2d at 212 (Page, J., concurring specially). The Fourth Amendment and Article I, Section 10, of the Minnesota Constitution provide that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. 4; Minn. Const. art. I § 10. This was not a search of a car during a routine traffic stop, or luggage given to airport baggage handlers. It was a search of a private residence, in which the resident rightfully has the highest expectation of privacy. As the Supreme Court observed in *Kyllo,*

the Fourth Amendment draws "a firm line at the entrance to the house." That line, we think, must be not only firm but also bright—which requires clear specification of those methods of surveillance that require a warrant. * * * Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.

533 U.S. at 40, 121 S.Ct. 2038 (citation omitted).

The court agrees that the use of the dog constituted a search, but sidesteps the issue of what the dog was searching by describing the search in innocuous terms: "the use of the narcotics-detection dog in the common hallway of an apartment building." The court having agreed that the use of the dog constituted a warrantless search, one might reasonably expect the court to then ask whether this search fell within one of the recognized exceptions to the requirement that a search be conducted under the authority of a warrant supported by probable cause, such as a search incident to arrest, or "hot pursuit," or even consent. But instead the court applies a balancing test to determine whether the use of the dog was an unreasonable intrusion into Davis's privacy.[1] I believe the court's application of a balancing test in these circumstances is also error.

The balancing test the court applies—a comparison between Davis's privacy expectations and the degree of intrusiveness of the search—has its roots in the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Court recognized "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27, 88 S.Ct. 1868. The Court did so by weighing "the nature and extent of the governmental interests involved," *id.* at 22, 88 S.Ct. 1868, against "the nature and quality of the intrusion on individual rights which must be accepted if police officers are to be conceded the right to search for weapons in situations where probable cause to arrest for crime is lacking." *Id.* at 24, 88 S.Ct. 1868.

But, and this is the critical point, in *Terry* the Supreme Court applied this balancing test only after acknowledging that, under the circumstances present in *Terry*, the Warrant Clause of the Fourth Amendment did not apply. The Court emphasized:

If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether "probable cause" existed to justify the search and seizure which took place. However, that is not the case. We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, or that in most instances failure to comply with the warrant requirement can only be excused by

---

1. As part of its justification for a lesser standard, the court notes with approval the argument that to require probable cause and a warrant before using a narcotics-detection dog would significantly reduce the "law enforcement utility" of such animals. It is obvious to me that a dog able to reliably detect the presence of narcotics could be invaluable, once police are properly inside a residence under the authority of a warrant, in narrowing the scope of the search.

exigent circumstances. But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.

*Terry,* 392 U.S. at 20, 88 S.Ct. 1868 (citations omitted). That is, the *Terry* balancing test is to be applied only in a circumstance that "historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.*

*Terry,* in turn, provided the basis for the Supreme Court's conclusion in *United States v. Place* that authorities could briefly seize a traveler's luggage, based only upon a reasonable, articulable suspicion of wrongdoing. 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The Court's opinion in *Place* does not explicitly discuss why the detention of Place's luggage was analyzed under the general reasonableness clause of the Fourth Amendment, rather than the Warrant Clause; indeed, Justice William Brennan's concurrence questioned the use of the balancing test at all. *Id.* at 718, 103 S.Ct. 2637 (Brennan, J., concurring). But one could imagine that a search of a traveler's luggage "as a practical matter could not be" subjected to the warrant requirement, *Terry,* 392 U.S. at 20, 88 S.Ct. 1868, particularly as world events have unfolded since *Place* was decided.

We, in turn, applied the *Terry* balancing test when we concluded in *Carter* that police needed nothing more than a reasonable, articulable suspicion of wrongdoing in order to conduct a search by dog sniff of the outside of a storage unit. 697 N.W.2d at 211. But, unfortunately, we failed to consider the threshold question required before applying the *Terry* balancing test, namely, whether the circumstances presented in *Carter* required "necessarily swift" actions, "which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." It is clear they did not. *Carter* was a dog-sniff search of a rented storage unit, which police had kept under surveillance for some four weeks. 697 N.W.2d at 203. Nothing precluded the police from obtaining a warrant to use a dog to search Carter's rented storage unit for narcotics except a lack of probable cause.

In applying the *Terry* balancing test in *Carter,* we also followed the lead of the Alaska Court of Appeals and the Pennsylvania Supreme Court, which have adopted the standard of reasonable, articulable suspicion to dog sniffs. 697 N.W.2d at 211 (citing *McGahan v. State,* 807 P.2d 506, 510–11 (Alaska Ct.App.1991), and *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74, 79 (1987)). The Alaska and Pennsylvania courts both concluded, as we did, that the dog sniff constituted a search. *McGahan,* 807 P.2d at 509; *Johnston,* 530 A.2d at 79 (dog sniff constituted a search under state law). And each employed the *Terry* balancing test to support the use of the dog sniff in the absence of a warrant or probable cause. *McGahan,* 807 P.2d at 510; *Johnston,* 530 A.2d at 79–80. The Pennsylvania court justified its use of the *Terry* balancing test on the following considerations:

> [A] canine sniff-search is inherently less intrusive upon an individual's privacy than other searches such as wiretapping or rummaging through one's luggage; it is unlikely to intrude except marginally upon innocent persons; and an individual's interest in being free from police harassment, annoyance, inconvenience and humiliation is reasonably certain of

protection if police must have a reason before they may, in the circumstances of this case, utilize a narcotics detection dog.

*Johnston,* 530 A.2d at 79–80. Similarly, the Alaska court cites "minimally intrusive" searches and seizures as "an exception to the warrant requirement." *McGahan,* 807 P.2d at 510 (citing *Hayes v. State,* 785 P.2d 33, 37 (Alaska Ct.App.1990)).

But the Supreme Court has refused to recognize "minimally intrusive" searches, at least in criminal cases, as an exception to the warrant requirement. In *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Court held that moving stereo equipment to note its serial numbers constituted a "search" that, in the absence of a warrant, was illegal. *Id.* at 324, 326, 107 S.Ct. 1149. As the Court observed, "A search is a search, even if it happens to disclose nothing but the bottom of a turntable." *Id.* at 325, 107 S.Ct. 1149. And, as the Court observed in *Katz,* in the absence of the procedural safeguards inherent in the warrant application process, "this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." 389 U.S. at 356–57, 88 S.Ct. 507.

Moreover, the Supreme Court's discussion of dog sniffs in *Place* raises serious doubt that the Court would approve of our reasonable, articulable suspicion standard for dog sniffs of a private residence. After all, the Court's observations about dog sniffs in *Place* were predicated on the Court's view that a dog sniff is not a search at all:

> The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog. Obviously, if this investigative procedure is itself a search requiring probable cause, the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test—no matter how brief—could not be justified on less than probable cause.

> \* \* \* \*

> In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here— exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 706–07, 103 S.Ct. 2637 (citations omitted). *See also City of Indianapolis v. Edmond,* 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search.").

Nor should we continue to blithely assume that dog sniffs are "minimally intrusive" in the sense we described in *Carter:* an investigative technique that discloses only the presence or absence of narcotics. 697 N.W.2d at 207. As Justice David Souter observed in his dissent in *Illinois v. Caballes,* the "infallible dog" is "a creature of legal fiction." 543 U.S. 405, 411, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (Souter, J., dissenting). In reality, even a "reliable" dog may alert when no narcotics are present (a false positive) between 7% and 38% of the time. *See United States v. Limares,* 269 F.3d 794, 797–98 (7th Cir. 2001).

As a result of all of this, our jurisprudence in this area has become what Justice Harry Blackmun warned of in his dissent in *Place:* "an emerging tendency on the part of the Court to convert the *Terry* decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable." *Place,* 462 U.S. at 721, 103 S.Ct. 2637 (Blackmun, J., dissenting). To the contrary, Justice Blackmun continued:

> While the Fourth Amendment speaks in terms of freedom from unreasonable seizures, the Amendment does not leave the reasonableness of most seizures to the judgment of courts or government officers: the Framers of the Amendment balanced the interests involved and decided that a seizure is reasonable only if supported by a judicial warrant based on probable cause.

*Id.* at 722, 103 S.Ct. 2637. We were wrong to apply the *Terry* balancing test to the search in *Carter,* and the court is wrong to apply a balancing test in this case as well.

This case marks a significant departure from our constitutional jurisprudence because it is the first time the court has authorized the search of a private residence based on anything less than probable cause in the absence of exigent circumstances. It is a departure that takes us down a road that erodes Fourth Amendment protections in one's home. That is a road I am unwilling to go down.

I respectfully dissent.

MEYER, J. (dissenting).

I join in the dissent of Justice Page.