*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-1991**

State of Minnesota,
Respondent,

vs.

Cooper Allen Thompson,
Appellant.

**Filed September 29, 2014**
**Affirmed**
**Larkin, Judge**

Anoka County District Court
File No. 02-CR-12-2373

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Bjorkman, Presiding Judge; Larkin, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges the district court's order denying his motion to suppress evidence obtained during a traffic stop, arguing that the police lacked reasonable suspicion to expand the traffic stop beyond the underlying justification for the stop and to conduct a dog sniff of the exterior of his vehicle. Because an informant's tip provided reasonable suspicion that appellant was engaged in drug-related criminal activity in his vehicle and, therefore, a constitutional basis existed to expand the stop and conduct the dog sniff, we affirm.

## FACTS

On April 4, 2011, Blaine Police Officer James Ross observed a small, black Mitsubishi Mirage with an unlit rear license plate. Officer Ross ran the car's license plate number and learned that the car was registered to appellant Cooper Allen Thompson. Officer Ross ran Thompson's name through the Anoka County Records Register and reviewed the most recent incident report regarding Thompson, which had been created by the Coon Rapids Police Department. The report indicated that two days earlier, an identified informant told the Coon Rapids police that Thompson was involved in ongoing drug-related criminal activity.

Specifically, the informant reported that Thompson sold heroin and prescription medication out of his car at a gas station and provided the address of the gas station. According to the report, Thompson was "selling five to six heroin eight balls a day along with several hundred tablets of prescription meds." The informant described Thompson's

car as a small, older, black passenger car and alleged that Thompson buys the narcotics in South Minneapolis. The informant also alleged that Thompson had a sawed-off shotgun in the vehicle, "possibly in the trunk." The report states that the informant told the police about Thompson's activities because the informant's friend almost overdosed on drugs that Thompson sold.

Officer Ross stopped the Mitsubishi based on the unlit license plate, which is a traffic violation. *See* Minn. Stat. § 169.50, subd. 2 (2010) (requiring cars "to illuminate with a white light the rear registration plate and render it legible from a distance of 50 feet to the rear"). Officer Ross approached the vehicle, asked the driver for his driver's license, and confirmed that Thompson was the driver. Officer Ross asked Thompson to get out of the vehicle. During their roadside conversation, Officer Ross asked Thompson if he had any drugs or weapons on him. Thompson agreed that Officer Ross could search him. During the ensuing search, Officer Ross found a blue metal cylinder vial in one of Thompson's pockets. Officer Ross testified that he recognized the vial as drug paraphernalia.

Officer Ross learned that a narcotics-detection canine was on duty nearby. The canine unit arrived at the scene and conducted a dog sniff of the exterior of Thompson's vehicle. The dog alerted to the vehicle's passenger compartment. An officer searched the passenger compartment and found aluminum foil with large black streaks in the glove compartment. Based on his training and experience, Officer Ross knew that heroin can be ingested by placing it on aluminum foil, burning it, and inhaling the smoke.

After finding the streaked foil, the officers searched Thompson's entire vehicle, including the trunk, where they discovered a metal vial containing three marble-sized balloons and a plastic baggie with a black tarry substance. Forensic testing indicated that the black tarry substance was 10.3 grams of heroin.

Respondent State of Minnesota charged Thompson with one count each of first- and second-degree controlled-substance crime. Thompson moved the district court to suppress the heroin, contending that it is the fruit of an unlawful expansion of the traffic stop. The district court denied Thompson's motion to suppress, concluding that "[t]he identified citizen informant tip . . . provided a reasonable, articulable suspicion of drug-related criminal activity to justify a lawful investigatory stop" and the dog sniff.

Thompson waived his right to a jury trial and agreed to a stipulated-facts trial. The district court found Thompson guilty of first-degree controlled-substance crime and sentenced him to serve 94 months in prison. Thompson appeals, challenging the district court's denial of his motion to suppress.

## D E C I S I O N

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures by the government. U.S. Const. amend. IV; Minn. Const. art. I, § 10. A police officer may, however, initiate a limited investigative stop without a warrant if the officer has reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880 (1968). Under the Minnesota Constitution, the police may not expand a routine traffic stop beyond the underlying justification for the stop unless there is a reasonable and articulable suspicion of criminal activity beyond the traffic offense.

4

*State v. Fort*, 660 N.W.2d 415, 416 (Minn. 2003); *see also State v. Askerooth*, 681 N.W.2d 353, 356 (Minn. 2004) (stating that the Minnesota Constitution "requires that each incremental intrusion during a traffic stop be individualized to the person toward whom the intrusion is directed and tied to and justified by one of the following: (1) the original purpose of the stop, (2) independent probable cause, or (3) reasonableness"). If there is reasonable, articulable suspicion of drug-related criminal activity, the police may lawfully conduct a narcotics-detection dog sniff around the exterior of a motor vehicle that has been stopped for a routine traffic violation. *State v. Wiegand*, 645 N.W.2d 125, 127-28 (Minn. 2002).

In this case, we focus our analysis on whether the informant's tip established reasonable suspicion of drug-related activity because if it did, the suspicion justified the expansion of the initial traffic stop and the dog sniff.

Whether the police have reasonable suspicion depends on the totality of the circumstances and a showing that an investigative seizure was not "the product of mere whim, caprice, or idle curiosity." *In re Welfare of M.D.R.*, 693 N.W.2d 444, 448 (Minn. App. 2005) (quotation omitted), *review denied* (Minn. June 28, 2005). Reasonable suspicion "need not arise from the personal observations of the police officer but may be derived from information acquired from another person." *Magnuson v. Comm'r of Pub. Safety*, 703 N.W.2d 557, 560 (Minn. App. 2005). A totality-of-the-circumstances approach is used to determine whether a tip establishes reasonable suspicion. *Alabama v. White*, 496 U.S. 325, 328, 110 S. Ct. 2412, 2415 (1990). The following factors are "highly relevant in determining the value" of a tip: the informant's veracity, reliability,

and basis of knowledge. *Id.* (quotation omitted). When applying these factors, allowance must be made for the lesser showing that is required to meet the reasonable-suspicion standard as compared to the probable-cause standard. *Id.* at 328-29, 110 S. Ct. at 2415.

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances—the whole picture, that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*Id.* at 330, 110 S. Ct. at 2416 (citation and quotation omitted).

Minnesota caselaw regarding whether an informant's tip establishes reasonable suspicion of criminal activity also focuses on the informant's reliability and the substance of the tip. *See Olson v. Comm'r of Pub. Safety*, 371 N.W.2d 552, 556 (Minn. 1985) (noting that the informant was anonymous and concluding that the tip lacked adequate specificity regarding why the tipster believed the suspect driver was drunk). Neither factor is dispositive; the determination of whether the officer had a reasonable suspicion is based on the totality of the circumstances. *Jobe v. Comm'r of Pub. Safety*, 609 N.W.2d 919, 921 (Minn. App. 2000). Appellate courts "presume that tips from private citizen informants are reliable." *State v. Davis*, 732 N.W.2d 173, 182 (Minn. 2007); *see also*

6

*State v. Ward*, 580 N.W.2d 67, 71 (Minn. App. 1998) ("A first-time citizen informant who has not been involved in the criminal underworld is presumed to be reliable. . . ."). We review de novo the legal issue of whether reasonable suspicion exists. *Wilkes v. Comm'r of Pub. Safety*, 777 N.W.2d 239, 242-43 (Minn. App. 2010).

With these principles in mind, we turn to the tip in this case.

*Reliability of the Informant*

We first consider what the police knew about the informant. The report regarding the tip lists April 2, 2011, as the "date of incident," provides a residential address as the location of the incident, and identifies the informant by his full name. The report also includes the informant's sex and date of birth. The district court determined that the informant was a private citizen whose reliability is presumed. Thompson argues that the district court erred by doing so because the report does not contain the informant's home address and does not indicate how the informant came into contact with the police.

Appellant's position has merit. The presumption of reliability only applies to citizen informants who are not involved in criminal activity. *See Davis*, 732 N.W.2d at 182; *Ward*, 580 N.W.2d at 71. In this case, the report regarding the tip does not state that the informant is a private citizen who is not involved in criminal activity. *See Ward*, 580 N.W.2d at 71 (stating that a search-warrant affidavit "must specifically aver that the informant is not involved in criminal activity."). Moreover, the report does not explain the underlying "incident" or how the informant came into contact with the police when he made his report. Because the record does not establish that the informant is a private

7

citizen who is not involved criminal activity, the informant's reliability may not be presumed.

However, the record contains other grounds for the police to have deemed the informant credible. The supreme court has relied on the fact that an informant "did not hide behind the cloak of anonymity" in finding the informant credible. *State v. Lindquist*, 295 Minn. 398, 400, 205 N.W.2d 333, 335 (1973). This court has similarly "distinguished between anonymous and identifiable informants." *Rose v. Comm'r of Pub. Safety*, 637 N.W.2d 326, 328 (Minn. App. 2001), *review denied* (Minn. Mar. 19, 2002). The informant here provided his name and date of birth. The incident report also lists an address. The police could use that identifying information to locate the informant and hold him accountable for his information. *See Lindquist*, 295 Minn. at 400, 205 N.W.2d at 335 ("One who voluntarily comes forward and identifies herself is more likely to be telling the truth because she presumably knows that the police could arrest her for making a false report."). The fact that the address associated with the informant's report is listed as an "incident" address and not as the informant's home address is not fatal. *See Jobe*, 609 N.W.2d at 922 ("While we agree that collecting addresses and phone numbers [from informants] would be a good practice for dispatchers to adopt, we do not believe the Fourth Amendment requires such a rule, and we decline to adopt it.").

In sum, even though it is not clear that the informant in this case is a private citizen whose reliability can be presumed, the circumstances nonetheless establish a basis for the police to have deemed the informant reliable.

*Substance of the Tip*

We next consider the "content" or "quantity" of the information possessed by the police when the police expanded the traffic stop and conducted the dog sniff. *See White*, 496 U.S. at 330, 110 S. Ct. at 2416. The informant provided detailed information regarding Thompson's dealings. The informant reported that Thompson sold heroin and prescription medication out of his car at a local gas station and provided the address of the gas station. According to the report, Thompson was "selling five to six heroin eight balls a day along with several hundred tablets of prescription meds." The informant described Thompson's car as a small, older, black passenger car. The informant stated that Thompson buys the narcotics in South Minneapolis. He also stated that Thompson had a sawed-off shotgun in the vehicle, "possibly in the trunk." The informant told the police that he wanted to report Thompson's activities because his friend almost overdosed on drugs that Thompson had sold.

Thompson argues that the substance of the tip was inadequate for several reasons. First, "the record does not establish that [the informant's] allegations were based on personal observations." Second, the informant's "bias was apparent from the information he provided." Third, the informant "reported his allegations two days before the traffic stop and those allegations were not based on any activity that happened shortly before the stop." Fourth, "Officer Ross was only able to verify the general description of Mr. Thompson's car, which was information that was easily obtainable." We address each argument in turn.

9

As to the lack of personal observations, it is true that "[r]ecent personal observation of incriminating conduct has traditionally been the preferred basis for an informant's knowledge." *State v. Wiley*, 366 N.W.2d 265, 269 (Minn. 1985). Although it may be the "preferred" basis for knowledge, it is not a requirement. *See State v. Cook*, 610 N.W.2d 664, 668 (Minn. App. 2000) (stating that an informant's basis of knowledge may be supplied directly, by firsthand information, or indirectly, "through self-verifying details that allow an inference that the information was gained in a reliable way"), *review denied* (Minn. July 25, 2000).

As to the informant's bias, Thompson argues that the informant "alleged that his friend nearly overdosed, which suggests that [he] was looking for someone to punish." But the supreme court has previously concluded that an informant's desire to protect others from the dangers of the drug trade is a motivation that lends credibility to the informant's tip. *See Lindquist*, 295 Minn. at 400, 205 N.W.2d at 335 (concluding that an informant was credible partly because, "the informer's motive seemed to be a sincere desire to protect her daughter and other children from the evils of the narcotics traffic which affects so many children").

As to the temporal concern, the informant stated that Thompson was selling drugs daily. "When an activity is of an ongoing, protracted nature, the passage of time is less significant." *State v. Hochstein*, 623 N.W.2d 617, 623 (Minn. App. 2001) (quotation omitted). Moreover, because ongoing criminal activity is comparable to a pending crime, the tip in this case tended to justify police action. *See Adams v. Williams*, 407 U.S. 143,

147, 92 S. Ct. 1921, 1924 (1972) (explaining that "an appropriate police response" should not be thwarted "when a credible informant warns of a specific impending crime").

As to the adequacy of corroboration, caselaw favors corroboration of predictions regarding future behavior that would only be known by someone with inside knowledge, as opposed to corroboration of information that is generally available to the public. *See White*, 496 U.S. at 332, 110 S. Ct. at 2417 ("What was important was the caller's ability to predict [the suspect's] *future behavior*, because it demonstrated inside information—a special familiarity with [the suspect's] affairs."). Although corroboration of future behavior is preferred to corroboration of general information, the corroboration of even minor details may lend credibility to the substance of a tip. *See Ward*, 580 N.W.2d at 71 (stating that an "informant's reliability may be established by sufficient police corroboration of the information supplied, and corroboration of even minor details can 'lend credence' to the informant's information where the police know the identity of the informant").

Ultimately, our assessment of the tip is based on the totality of the circumstances, and reasonable suspicion is a lesser standard. *See White*, 496 U.S. at 328-29, 110 S. Ct. at 2415 (comparing probable-cause and reasonable-suspicion standards). Here, an identified informant informed the Coon Rapids police that Thompson sold "five to six heroin eight balls" and "several hundred tablets of prescription meds" from a small, older, black passenger car on a daily basis at a local gas station. Two days later, the police observed a vehicle that matched that description and confirmed that Thompson was the registered owner of the vehicle. We conclude that under the totality of the

11

circumstances—including the informant's known identity, the informant's detailed description of on-going drug-related activity in Thompson's car, and the officer's corroboration of minor details regarding Thompson's car—the tip provided reasonable suspicion that Thompson was involved in drug-related criminal activity and, therefore, a basis to expand the scope of the traffic stop.

Thompson argues that "[e]ven if this court concludes that [the informant's] allegations gave Officer Ross reasonable articulable suspicion . . . that suspicion was dispelled by what the officer learned after the stop." Thompson notes that there were no drugs or weapons in plain sight, he did not appear to be under the influence, he was not acting unusual, and he was cooperative. But it is not surprising that an individual who is involved in illegal activities would not leave evidence of those activities in plain sight in his vehicle. Moreover, the informant did not report that Thompson used drugs, so the lack of indicia of use is not dispositive. And even if Thompson cooperated with Officer Ross, such cooperation did not necessarily "dispel" the officer's reasonable suspicion because it did not negate the factual allegations on which the suspicion was based. *Cf. State v. Mahr*, 701 N.W.2d 286, 290-91 (Minn. App. 2005) (concluding that an officer's "initial suspicions based on the suspended license of the male registered owner were dispelled" after approaching the vehicle and observing that the driver was female), *review denied* (Minn. Oct. 26, 2005).

Once again, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *White*, 496 U.S. at 330, 110 S. Ct. at 2416. The state need only show that the officers' actions were not the product of "mere whim,

12

caprice, or idle curiosity." *Wiegand*, 645 N.W.2d at 134 (quotation omitted). The officers in this case did not act on whim or idle curiosity; they acted on the basis of a tip. Because that tip was adequately reliable under the reasonable-suspicion standard, it provided the necessary "minimal level of objective justification" for the expanded investigation and dog sniff in this case. *White*, 496 U.S. at 329-30, 110 S. Ct. at 2416 (quotation omitted); *see also Wiegand*, 645 N.W.2d at 135 (holding that officers need "reasonable, articulable suspicion of drug-related criminal activity" to conduct a dog sniff).

As to the search of Thompson's vehicle following the dog's alert, "[a] law enforcement officer may make a warrantless search of an automobile when there is probable cause to believe the vehicle contains contraband." *State v. Pederson-Maxwell*, 619 N.W.2d 777, 780 (Minn. App. 2000). The dog alerted to the passenger compartment of Thompson's vehicle, and this alert provided probable cause to search the vehicle. *See id.* at 781 (holding dog's reaction when sniffing exterior of vehicle, which alerted officer to the presence of controlled substances, established probable cause that there was contraband in the car). The ensuing discovery of aluminum foil with large black streaks in the glove compartment provided additional probable cause. *See State v. Darnall*, 498 N.W.2d 295, 295 (Minn. App. 1993) ("Lawful discovery of contraband in a vehicle provides probable cause for a further search of every part of the vehicle that may conceal the object of the search.").

In sum, the informant's tip established reasonable suspicion that Thompson was involved in drug-related criminal activity. The tip therefore provided a basis to expand

13

the traffic stop beyond its underlying justification and to conduct a dog sniff of Thompson's vehicle, which led to probable cause to search Thompson's vehicle. The seizure and search therefore were constitutionally reasonable, and the district court did not err by denying Thompson's motion to suppress.

**Affirmed.**